**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOAN PIRUNDINI,<br><br>                         Plaintiff,<br><br>         -v.-<br><br>J.P MORGAN INVESTMENT<br>MANAGEMENT INC.,<br>                  Defendant. | No. 17 Civ. 3070<br><br><br>**COMPLAINT** |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................ 1

II.   JURISDICTION AND VENUE .......................................................... 3

III.  PARTIES ......................................................................................... 3

     A.   Plaintiff ................................................................................... 3

     B.   Defendant ............................................................................... 3

IV.   BACKGROUND:  THE PROBLEM OF "CAPTIVE" MUTUAL  FUNDS, AND
      CONGRESS' EVOLVING RESPONSE TO SUCH  PROBLEMS VIA THE ICA ......... 4

     A.   Mutual Fund Organization and Operation ............................................. 4

     B.   The Unique Structure of the Mutual Fund Industry Makes Mutual Funds
          "Captive" to their Investment Advisers ................................................. 6

     C.   The ICA, as Enacted in 1940, Sought to Limit Investment Advisers'
          Influence and Control over Captive Funds by Requiring Independent
          Boards  to Approve Fund Fees ............................................................. 8

     D.   The ICA's 1970 Amendments, Including Section 36(b), Were Intended
          to  Decrease the Deference Accorded to Board Evaluation and Approval
          of Fund  Fees, and Increase the Ability of Fund Shareholders to Challenge
          Excessive  Fees ..................................................................................... 10

V.    THE FUND'S ORGANIZATION AND OPERATIONS ................................. 14

     A.   Organization of the Fund ...................................................................... 14

     B.   The Fund's Operations and Service Providers ......................................... 14

          1.   The Fund's Investment Adviser .................................................. 14

          2.   The Fund's Other Service Providers ........................................... 15

                a. The Fund's Transfer Agent ...................................... 15

                b. The Fund's Custodian and Accounting Agent ...................... 16

                c. The Fund's Administrator ...................................... 18

                d. The Fund's Distributor and Shareholder Servicing Agent .................. 21

          3.   The Fund's Board of Trustees .................................................. 24

VI.  THE SERVICES JPMIM PROVIDED, AND THE FEES JPMIM  CHARGED,
TO THE FUND ............................................................................................... 24

    A.  The Investment Advisory Services Provided by JPMIM to the Fund ................. 24

        1.  Portfolio Selection Services ..................................................... 25

            a. The Investment Objective Pursued by JPMIM for the Fund .............. 27

            b. The Principal Investment Strategies Employed by JPMIM
for the Fund ...................................................................... 27

            c. The Investment Process Employed by JPMIM for the Fund .............. 29

            d. The JPMIM Portfolio Managers Responsible for Managing
the Fund .......................................................................... 30

        2.  Other Services ..................................................................... 31

    B.  The Advisory Fee Rates Charged by JPMIM and the Advisory Fees Paid
by  the Fund ....................................................................................... 32

        1.  The Advisory Rate Charged to the Fund by JPMIM ............................... 32

        2.  The Fee Waiver Agreement ...................................................... 32

        3.  The Advisory Fees Paid by the Fund ............................................ 34

VII. JPMIM EXTRACTED EXCESSIVE FEES FROM THE FUND ...................................... 35

    A.  Comparative Fee Structures ................................................................... 35

        1.  JPMIM Provided its Other Clients with Substantially Similar
Investment Advisory Services at Substantially Lower
Advisory Fee  Rates ............................................................... 36

            a. Comparison to the JPM Equity Fund ................................... 37

            b. Comparison to the PSF Subadvised Fund ............................. 42

        2.  Comparable Funds Paid Lower Advisory Fees
for Similar Investment  Advisory Services ................................. 49

        3.  The Board Performed Similar Comparisons Yielding
Similar Factual  Results (but Different Conclusions) ............................... 51

    B.  Economies of Scale ............................................................................ 52

        1.  Background on Economies of Scale in Mutual Funds .............................. 53

        2.  The Fund's Growth Generated Significant Economies of Scale
that  JPMIM Largely Monopolized ............................................ 56

            a. The Fund's Growth Generated Significant Economies of Scale ......... 57

            b. JPMIM Monopolized the Economy of Scale Benefits
that the Fund's Size Provided ............................................ 61

       c. The IAA Provided no Breakpoints to Share Any Portion of the Economy of Scale Benefits Generated by the Fund's Size with the Fund's Shareholders ........................................................ 62

C.    The Nature and Quality of the Investment Advisory Services JPMIM  Provided to the Fund.................................................................. 62

    1.    The *Nature* of the Services JPMIM Provided as *Investment Adviser* to  the Fund ........................................................... 62

    2.    The *Quality* of the Such Services.............................................. 63

D.    The Profitability of the Fund to the Adviser ......................................... 65

E.    Fall-Out Financial Benefits Attributable to the Fund .......................... 67

F.    The Care and Conscientiousness of the Fund's Board in Approving  Continuation of the IAA and the Fund's Advisory Fees .............. 69

    1.    The Fund's Board ..................................................................... 71

    2.    The Board Approved Substantively Excessive Advisory Fees................. 73

    3.    The Board's Deficient Approval Process ................................. 73

        a. Board Evaluation of Fee Comparisons ................................. 82

        b. Board Evaluation of Economies of Scale............................. 88

        c. Board Evaluation of the Nature, Extent and Quality of Services ........ 90

        d. Board Evaluation of Profitability .......................................... 93

        e. Board Evaluation of Fallout Benefits.................................... 95

    4.    The Board Rubber-Stamped the Advisory Fees that JPMIM Proposed ... 97

VIII.  THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE  FUND ............... 99

CAUSES OF ACTION ........................................................................... 100

COUNT I:  ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY (EXCESSIVE INVESTMENT ADVISORY FEES)............................................ 100

PRAYER FOR RELIEF ......................................................... 102

iv

**List of Exhibits**

Exhibit A      Detailed Comparison of the Services JPMIM Provided to the Fund, the JPM Equity Fund, and the PSF Subavised Fund

Exhibit B      Portfolio Management Agreement between PFLA and JPMIM for the PSF Subadvised Fund, dated May 1, 2008, as amended

Exhibit C1     Advisory Fees Paid by U.S. Large-Cap Blend Mutual Funds (listed alphabetically, by fund name)

Exhibit C2     Advisory Fees Paid by Large U.S. Large-Cap Blend Mutual Funds (only funds with net assets > $1 billion; listed in descending order of fees)

Exhibit D      Advisory Fees Paid by JPMC Fund Family Equity-Focused Mutual Funds  (only funds with net assets > $3 billion; listed in descending order of fees)

Exhibit E      JP Morgan U.S. Large Cap Core Plus Fund – Historical Data Relevant to Analysis of  Economies of Scale

Plaintiff Joan Pirundini ("Plaintiff"), by Plaintiff's undersigned counsel, brings this action against J.P. Morgan Investment Management Inc. ("JPMIM" or "Defendant") and alleges as follows.  The following allegations are based on knowledge as to Plaintiff and Plaintiff's own actions, and on information and belief, based on the investigation of Plaintiff's counsel, as to all other matters.  Such investigation included, but was not limited to, a review and analysis of documents, including filings with the Securities and Exchange Commission ("SEC"), concerning *inter alia*:  (a) JPMIM and the investment advisory services it offers to its various advisory clients; (b) JPMIM's "captive" JP Morgan U.S. Large Cap Core Plus Fund ("the Fund"), a mutual fund for which JPMIM serves as investment adviser; (c) other mutual funds, sponsored and advised by other investment advisers who retained JPMIM as a sub-adviser for such funds; and (d) other matters of public record.  Many of the facts supporting the allegations contained herein are known only to Defendant or are exclusively within Defendant's custody and/or control.  Plaintiff believes that a reasonable opportunity for discovery will yield additional, substantial evidentiary support for the allegations herein.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action against Defendant on behalf of and for the benefit of the JP Morgan U.S. Large Cap Core Plus Fund, pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b) (hereinafter, "Section 36(b)").

2.    JPMIM, as the Fund's investment adviser, manages the Fund's investment portfolio, and receives investment advisory fees from the Fund for providing the Fund with investment advisory services, as further specified herein.

3.    Under Section 36(b), Defendant owes a fiduciary duty to the Fund with respect to the investment advisory fees paid by the Fund.

4.       Defendant breached that fiduciary duty by receiving investment advisory fees from the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMIM, and could not have been the product of arm's-length bargaining (hereinafter, "excessive" fees).

5.       Particularized factual allegations set forth herein demonstrate, *inter alia*, that the investment advisory fee rates that Defendant extracts from the Fund:

a.       constitute a mark-up of 100% over the advisory fee rates that Defendant charges to provide another mutual fund in the JPMC Fund Family, the JP Morgan U.S. Equity Fund ("JPM Equity Fund"), with substantially similar, and in large part effectively identical, investment advisory services as those Defendant provides to the Fund;

b.       constitute a mark-up of approximately 28.5% over the advisory fee rates that Defendant charges to provide another non-JP Morgan mutual fund, the Pacific Select Fund Long/Short Large-Cap Portfolio ( "PSF Subadvised Fund"),  with substantially similar, and in large part effectively identical, investment advisory services as those Defendant provides to the Fund;

c.       more than *double* the average advisory fee rate paid by comparable mutual funds;

d.       are *outliers*, standing at the highest end of the range of advisory fee rates paid by such comparable mutual funds; and

e.       indeed, **are higher than the rates charged to *any, and all*, other comparable mutual funds of similar large size** (*i.e.*, exceeding $1 billion of net assets).

6.     Plaintiff brings this action to recover for the Fund the excessive and unlawful investment advisory fees extracted by Defendant in violation of Section 36(b), as well as lost profits and other actual damages caused by the Fund's payment of such excessive fees.

7.     Because the conduct complained of herein is continuing in nature, Plaintiff seeks recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

8.     No pre-suit demand on the Fund's Board of Trustees is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions brought under Section 36(b).

## II.     JURISDICTION AND VENUE

9.     The claim asserted herein arises under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

10.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5) and 80a-43, and 28 U.S.C. § 1331.

11.     Venue is proper in this judicial district pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391, because Defendant maintains offices in this district, and/or transacts business in this district.

## III.     PARTIES

### A.     Plaintiff

12.     Plaintiff Joan Pirundini is a shareholder in the JP Morgan Large Cap Core Plus Fund, and has continuously owned shares in that Fund since at least August 2012.

### B.     Defendant

13.     Defendant JP Morgan Investment Management Inc., a corporation organized under the laws of Delaware and with principal offices located at 270 Park Avenue, New York,

NY 10017, is an SEC-registered investment adviser, with approximately $1.14 trillion in assets under management.

14.     JPMIM is a wholly-owned subsidiary of J.P. Morgan Asset Management Holdings, Inc., which in turn is a wholly-owned subsidiary of JPMorgan Chase & Co. ("JPMC"). As explained in JPMIM's July 2016 Form ADV filed with the SEC, JPMIM "is the primary U.S. investment advisory branch of J.P. Morgan Asset Management ('JPMAM')," and "JPMAM is the marketing name for the asset management businesses of [JPMC]."  *See* JPMIM July 2016 Form ADV Part 2A (Firm Brochure) (hereinafter, "Form ADV"), at 5.

15.     As such, JPMIM serves as the investment adviser for, *inter alia*:

    a.     an array of mutual funds established and sponsored by JPMC and JPMIM for which JPMIM serves as investment adviser (the "JPMC Fund Family"); and

    b.     other clients not affiliated with JPMC or JPMIM, to whom it offers a variety of investment strategies that, as further described below, are substantially similar and/or effectively identical to the investment strategies that JPMIM provides to the mutual funds in the JPMC Fund Family, including the Fund.

## IV.   BACKGROUND:   THE PROBLEM OF "CAPTIVE" MUTUAL FUNDS, AND CONGRESS' EVOLVING RESPONSE TO SUCH PROBLEMS VIA THE ICA

### A.   Mutual Fund Organization and Operation

16.     Open-end management investment companies, also known as a "mutual funds," are collective investment vehicles that pool money from investors (raised through sale of shares in the fund) and invest the money in a portfolio of securities.  Each share issued by the Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

17.     Unlike other companies, a mutual fund has no employees or facilities of its own. Instead, mutual funds contract with and rely on a variety of external service providers to perform the fund's business activities and operations.

18.     Chief among these mutual fund service providers is the investment adviser, who is charged with managing the mutual fund's portfolio of securities, including researching potential investments and deciding which securities – in which amounts, and at what times – to purchase for or sell from the portfolio.

19.     Other service providers provide mutual funds with the remaining services required for their operation, including: (1) a panoply of service providers that provide various administrative, mechanical or "back office" functions, and (2) a board of directors that provides oversight over the funds' various service providers.

          a.     For example, a "transfer agent" provides much of the day-to-day operational services requisite for mutual fund functioning, such as:  (1) receiving and processing mutual fund share purchase and sale/redemption requests; (2) transferring shares; (3) preparing shareholder account statements and confirmations; (4) responding to shareholder inquiries concerning account status, portfolio performance, distributions and share price; and (5) providing shareholders with copies of account histories.

          b.     Further mutual fund operations – including provision of custodial, audit, accounting, legal, compliance and marketing services – are separately provided by further third parties (*e.g.*, custodians, auditors, accountants, counsel, distributors), and separately compensated by mutual funds.

c.     Lastly, operational oversight is provided by a board of directors, who, among other things, evaluate and approve the contracts between mutual funds and their service providers, and the services provided under such contracts.

**B.     The Unique Structure of the Mutual Fund Industry Makes Mutual Funds "Captive" to their Investment Advisers**

20.     As a practical and historical matter, mutual funds have typically been created by investment advisers, who then provide investment advisory services to such mutual funds in exchange for investment advisory fees.  Frequently, persons affiliated with such investment advisers are appointed to serve on such mutual funds' boards of directors, and affiliates of the investment adviser are retained to provide further services to such mutual funds (for example, distribution).

21.     Consequently, the relationship between investment advisers and mutual funds has been fraught with potential conflicts of interests, and the potential for abuse is inherent in the structure of such investment companies.

22.     For example, prior to regulation (discussed below) that required mutual funds to have independent board members review and approve investment advisory fees, investment advisers could both propose their own fees (wearing their "investment adviser" hat) and ratify such fees (wearing their "board" hat).

23.     Yet even after multiple rounds of legislation and regulation seeking to institute mutual funds boards independent of mutual fund investment advisers, Congress has recognized that such legislation and regulation do not alter the fundamental structural fact that mutual funds do not have an arm's-length relationship with their investment advisers.  As the Senate stated in 1969, in its report accompanying proposed amendments to the ICA, including Section 36(b), enacted in 1970:

6

Mutual funds, with rare exception, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, that are separately owned and operated. These separate organizations are usually called investment advisers. The advisers select the funds' investments and operate their businesses. . . .

Because of the unique structure of this industry, the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships. Since a typical fund is organized by its investment adviser which provides it with almost all management services . . ., a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

*See* S. Rep. No. 91–184, 1970 U.S.C.C.A.N. 4897 (hereinafter, "Senate Report"), at 4901.

24. The peculiar dependence of mutual funds upon their founding/sponsoring investment advisers makes such funds, in effect, "captive" to their investment advisers. Mutual funds established by investment adviser sponsors are hereinafter referred to as "captive funds."

25. Historically, captive funds' dependence on and/or loyalty to their investment advisors has allowed investment advisors and their affiliates a decided advantage in negotiating the terms of the contractual relationships between them and the captive funds. In essence, because mutual funds cannot (and do not) "walk away" from their investment advisers, mutual funds have less ability to reject or negotiate the terms and conditions proposed and preferred by their investment advisers. Investment advisory fees are one of the principal matters affected by this state of affairs. While it is in the interest of the mutual fund, and mutual fund shareholders, to secure investment advisory fees that are as low as possible, the investment adviser's interests are the very opposite: to secure investment advisory fees as high as possible. Historically, such

conflicts of interests have generally been resolved in investment advisers' favor and to captive

funds' detriment.

26.     As a result, captive funds have historically paid – and often continue today to pay

– relatively high and/or excessive investment advisory fees.

> **C.      The ICA, as Enacted in 1940, Sought to Limit Investment Advisers'
> Influence and Control over Captive Funds by Requiring Independent Boards
> to Approve Fund Fees**

27.     In 1940, responding to numerous problems and abuses in the then-lightly

regulated mutual fund industry, Congress enacted the ICA in order to create standards of

operation and care applicable to investment advisers and their affiliates.  In its "Findings and

Declaration of Policy" preamble to the ICA, Congress recognized that "investment companies

are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather

than in the interests of [mutual fund shareholders]."  15 U.S.C. § 80a-1(b)(2).

28.     In order "to mitigate and, so far as it is possible, to eliminate the conditions [] that

adversely affect [] the interests of investors" (15 U.S.C. § 80a-1(b)), the ICA, as originally

enacted in 1940, sought to bolster the ability of mutual fund boards to act *independently* of the

investment advisers by:  (1) requiring that at least 40% of a mutual fund's board consist of

persons neither employed by nor affiliated with the investment adviser (15 U.S.C. § 80a-10); and

(2) requiring that such boards review and approve written contracts between the mutual fund and

the investment adviser (and other key service providers) (15 U.S.C. § 80a-16).  In sum, and as

originally enacted, the ICA placed mutual fund boards in the role of "independent watchdog,"

and relied wholly on fund boards to "furnish a check upon the management" of mutual funds by

the funds' investment advisers.

29.     Notwithstanding these and other of the ICA's initial provisions, decades of

excessive investment advisory fees extracted from captive funds thereafter followed.  The ICA's

8

original regulatory schema, which relied solely on mutual fund boards to police fund fees, proved insufficient.

30.    First, evidence indicated that, notwithstanding the ICA's original regulations concerning mutual fund board duties and independence, the investment advisory fees paid by mutual funds were comparatively high and disproportionate to the services provided.

a.    For example, an SEC-commissioned study found that investment advisers often charged mutual funds higher fees than those charged to the advisers' other clients, and that the structure of the industry, even as regulated by the ICA, had proved resistant to efforts to moderate adviser compensation. *See* Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., 28-30, 34, 66-67 (1962).  The study explicitly concluded that the unaffiliated directors mandated by the ICA were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser." *Id.* at 34.

b.    Likewise, a subsequent report authored by the SEC itself found that as mutual funds grew in size, the investment advisory fees they paid became increasingly unmoored from the advisory services provided.  *See* Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 89 (1966) (hereinafter "SEC Report").  Specifically, noting that investment advisers were generally compensated on the basis of a fixed percentage of a fund's assets (rather than on services rendered or actual expenses), the SEC determined that, as a fund's assets grew, this form of payment could produce "unreasonable" fees in light of the economies of scale realized in managing a larger portfolio. SEC Report at 94, 102.

31.     Second, evidence further indicated that where fund shareholders had sought to challenge the propriety of director-approved mutual fund advisory fees, such efforts had failed because of the imposing legal standards employed by courts to evaluate such fees and challenges to them.  *See* SEC Report at 132-43 (noting use of "corporate waste" standard to review fees approved by fund directors, so that only "unconscionable" or "shocking" fees conferred liability).  Such standards, in effect, allowed directors' approval of fees – notwithstanding substantial evidence that such fees were frequently excessive – to place such fees beyond, and immune to, legal challenge from fund shareholders.  *Id.*

> **D.     The ICA's 1970 Amendments, Including Section 36(b), Were Intended to Decrease the Deference Accorded to Board Evaluation and Approval of Fund Fees, and Increase the Ability of Fund Shareholders to Challenge Excessive Fees**

32.     The above-mentioned evidence led directly to amendment of the ICA in 1970, as the Senate explicitly acknowledged in its report accompanying such amendments:

> In total this bill represents a 3-year effort on the part of your committee to deal with the problems described in the 1962 Wharton School of Finance and Commerce study of mutual funds, the 1963 special study of the securities markets made by the Securities and Exchange Commission and the Commission's 1966 report on public policy implications of investment company growth.

*See* Senate Report, at 4897-98.

33.     In relevant part, the 1970 amendments to the ICA were threefold:

        a.     First, strengthening board independence, by rewriting 15 U.S.C. § 80a-(10) (now requiring at least 40% of board members to be "uninterested" persons, rather than merely persons unaffiliated with the investment adviser); *see also* 15 U.S.C. § 80a-(2)(a)(19) (defining "interested" persons);

10

b.     Second, strengthening board diligence with respect to evaluation and approval of advisory fees, by rewriting 15 U.S.C. § 80a-(15)(c) to add that "it shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve as investment adviser of such company."; and

c.     Third, easing extant legal standards facing fund shareholders seeking to challenge fund advisory fees, by adding and enacting the new Section 36(b), which (1) conferred a fiduciary duty on investment advisers and their affiliates with respect to the payments they received from mutual funds; and (2) provided fund shareholders (as well as the SEC) with a private right of action, against the investment adviser, for breach of such fiduciary duty.

34.     Section 36(b)'s inclusion in the mutual fund regulatory schema indicates Congressional recognition that placing sole reliance on mutual fund boards to guard against excessive mutual fund advisory fees (1) had failed (as had been evidenced during the three decades following passage of the ICA in 1940), and (2) would *continue* to fail, notwithstanding the 1970 amendments strengthening boards' independence and diligence.

35.     And while the ICA as amended in 1970 still relied on fund boards to evaluate and determine fund fees in the first instance, the 1970 amendments, including Section 36(b), demonstrated clear Congressional intent that the extant deference accorded to boards' fee determinations be *lessened*.

a.     First and generally, merely by adding Section 36(b) and its right of action for fund shareholders to challenge fund fees notwithstanding fund directors' approval of such

fees, Congress recognized that board review and approval of fees did not per se guarantee that the fees approved would not be excessive.

b.      Second and more specifically, Congress explicitly instructed courts, when evaluating  investment advisory fees challenged as excessive: (1) "to consider the approval given by the directors"; (2) to give to such approval "such consideration as the court deems appropriate under the circumstances"; and (3) to employ a sliding scale of deference to such directorial approval based on such circumstances, including the degree to which the fee-setting "deliberations of the directors were a matter of substance or a mere formality:"

> The directors of a fund have the initial responsibility for approving management contracts. *Section 36(b)(2) therefore instructs the courts to consider the approval given by the directors of the fund to such compensation and provides that their approval shall be given such consideration as the court deems appropriate under all the circumstances. Among other things, the court might wish to evaluate whether the deliberations of the directors were a matter of substance or a mere formality.*

*See* Senate Report at 4910 (emphasis added).

c.      Third, Congress also explicitly indicated that its intent in enacting Section 36(b) was to *decrease* the legal obstacles facing mutual fund shareholders seeking to challenge excessive fees, and to *lower* the applicable legal standards used by courts to adjudicate such challenges:

> [The ICA's original] provisions did not provide any mechanism by which the fairness of management contracts could be tested in court. Under general rules of law, advisory contracts which are ratified by the shareholders, or in some states approved by a vote of the disinterested directors, may not be upset in the courts except upon a showing of "corporate waste." As one court put it, the fee must "shock the conscience of the court." *Such a rule may not be an improper one when the protections of arm's-length bargaining are present. But in the mutual fund industry where, these marketplace forces are not likely to operate as effectively, your committee has decided that the standard of "corporate waste" is unduly restrictive and recommends that it be changed.*

12

\* \* \*

> Thus, upon a challenge in court to compensation or payments, the ultimate test, even if the compensation or payments are approved by the directors and stockholders, will not be whether it involves a "waste" of corporate assets but will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee.

*See* Senate Report at 4901 and 4910 (emphasis added).

36.     Lastly, Congress also and explicitly noted that its addition of Section 36(b) was intended to address the problem of excessive fees generated by "economies of scale" – *i.e.*, that director-approved fund fees continued to be set at high rates notwithstanding (1) that funds had grown substantially in size, and (2) that the costs to provide such funds with advisory services had not grown at the same rate, because of economies of scale in the provision of advisory services (as further explained in Section VI.C, *infra*).   Congress made clear its intent that "investors should share equitably, as they do in other areas, in the economies," and that such sharing could be accomplished through fund advisors' "reduc[ing] their effective charges as the funds grows in size" (*i.e.*, "breakpoints," as further explained in Section VI.C, *infra*):

> This bill recognizes that investors should share equitably, as they do in other areas, in the economies available as a result of the growth and general acceptance of mutual funds.
>
> \*\*\*
>
> It is noted, however, that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*See* Senate Report at 4901 and 4902.

## V.    THE FUND'S ORGANIZATION AND OPERATIONS

### A.    Organization of the Fund

37.    The Fund is organized and exists as one among dozens of separate series, each a distinct mutual fund, within JPMorgan Trust I (hereinafter, the "JPMC Trust"), an open-end management investment company organized under Delaware law  as a Delaware statutory trust pursuant to a declaration of trust dated November 5, 2004.

38.    The JPMC Trust was created by JPMC and JPMIM as a means to create, house and organize captive mutual funds, including the Fund and many other funds in the JPMC Fund Family, as captive clients for JPMIM's investment advisory services.

39.    The JPMC Trust is one of several such vehicles in which JPMC and JPMIM house captive mutual funds (others include the JPMorgan Trust II, the JPMorgan Trust III, the JPMorgan Trust IV, the J.P. Morgan Mutual Fund Investment Trust, etc.)

### B.    The Fund's Operations and Service Providers

40.    The Fund, like all of the other mutual funds within JPMC Trust and/or part of the JPMC Fund Family, has no employees of its own.  Instead, operations are carried out by an array of external service providers who provide the same services to each of the mutual funds within the JPMC Trust, pursuant to contracts between the service providers and the JPMC Trust.

### 1.    The Fund's Investment Adviser

41.    JPMIM serves as the investment adviser for each of the mutual funds in the JPMC Fund Family, including the Fund, pursuant to an Investment Advisory Agreement between the JPMC Trust and JPMIM entered into on August 10, 2006 (hereinafter, the "IAA").  As the JPMC Trust's investment adviser and pursuant to the IAA, JPMIM researches potential investments, selects particular investments for each funds' portfolio, and manages such portfolios on an ongoing basis.

14

42.     The services provided by JPMIM as the Fund's investment adviser and pursuant

to the IAA are further detailed in Sections VI.A and VII.A.1, *infra*.

### 2.     The Fund's Other Service Providers

43.     Other service providers provide the JPMC Fund Family funds in the JPMC Trust

with the rest of the services they require to function, including substantially all "back office,"

administrative, regulatory and shareholder-facing services.

### a.     The Fund's Transfer Agent

44.     Boston Financial Data Services, Inc. ("BFDS") serves as Transfer Agent and

Dividend Disbursing Agent for each of the captive mutual funds in the JPMC Trust and the

JPMC Fund Family, including the Fund, pursuant to a Transfer Agency and Service Agreement

dated February 19, 2005 (the "Transfer Agency Agreement").  The list of services provided by

BFDS to the Fund, set forth at Section 4 of the Transfer Agency Agreement, is quite long.[1]  In

---

[1] Such services include, but are not limited to, the following services set forth in Section 4.D of the Transfer Agency
Agreement:

| | |
|---|---|
| (i) | issuing (including countersigning), transferring and canceling Certificates; |
| (ii) | maintaining all shareholder accounts; |
| (iii) | providing transaction journals; |
| (iv) | once annually preparing shareholder meeting lists for use in connection with the annual meeting and certifying the shareholder votes of the Trust; |
| (v) | mailing shareholder reports and prospectuses; |
| (vi) | withholding, as required by federal law, taxes on shareholder accounts, disbursing income dividends and capital gains distributions to shareholders, preparing, filing and mailing U.S. Treasury Department Forms 1099, 1042, and 1042S and performing and paying backup withholding as required for all shareholders |
| (vii) | preparing and mailing confirmation forms to shareholders and dealers, as instructed, for all purchases and liquidations of shares of the Trust and other transactions in shareholders' accounts requiring confirmation under applicable law; |
| (viii) | recording reinvestment of dividends and distributions in Shares; |
| (ix) | providing or making available on-line daily and monthly reports as both are regularly provided by the TA2000(TM) System and as requested by the Trust or its management company; |
| (x) | maintaining those records necessary to carry out BOSTON FINANCIAL's duties hereunder, including all information reasonably required by the Trust to account for all transactions in the Shares; |
| (xi) | calculating the appropriate sales charge with respect to each purchase of the Shares as set forth in the prospectus for the Trust, determining the portion of each sales charge payable to the dealer participating in a sale in accordance with schedules delivered to BOSTON FINANCIAL by the Trust's principal underwriter or distributor (hereinafter "principal underwriter") from time to time, disbursing dealer commissions collected to such dealers, determining the portion of each sales charge payable to such principal underwriter and disbursing such commissions to the principal underwriter; |

15

essence, the transfer agent maintains the accounts of fund shareholders, and handles all fund shareholder transactions.  As transfer agent, BFDS, as explained in the registration statement for the JPMC Funds,  "is responsible for maintaining account records, detailing the ownership of Fund shares and for crediting income, capital gains and other changes in share ownership to shareholder accounts."  The Transfer Agency Agreement sets forth the fees payable to BFDS for it provision of such services.

### b.  The Fund's Custodian and Accounting Agent

45.     JP Morgan Chase Bank, N.A. ("Chase") serves as Custodian and Fund Accounting Agent for each of the captive mutual funds in the JPMC Trust (and for all of the captive funds in the JPMC Fund Family), including the Fund, pursuant to an Amended and Restated Global Custody and Fund Accounting Agreement dated September 1, 2010 (the "Custody/Accounting Agreement").  Again, the list of services provided by Chase pursuant of the Custody/Accounting Agreement is quite long.  *See* Custody/Accounting Agreement at Sections 2.1-2.19 (custodial services), 8.2 (tax relief services) and Schedules C (listing fund

---

(xii)   receiving correspondence pertaining to any former, existing or new shareholder account, processing such correspondence for proper recordkeeping, and responding promptly to shareholder correspondence;

(xiii)   mailing to dealers confirmations of wire order trades; mailing copies of shareholder statements to shareholders and dealers in accordance with the Trust's instructions;

(xiv)   processing, generally on the date of receipt, purchases or redemptions or instructions to settle any mail or wire order purchases or redemptions received in proper order as set forth in the prospectus, rejecting promptly any requests not received in proper order (as defined by the Trust, the Trust's agents or prospectus, or the Procedures, as hereinafter defined), and causing exchanges of shares to be executed in accordance with the Trust's instructions and prospectus, the Procedures and the general exchange privilege applicable;

(xv)   operating the order desk on behalf of the Trust for the purpose of taking trade orders from broker-dealers and institutions, confirming orders on "T+1" (Trade Date Plus One), monitoring the settlement of such orders and advising the Trust once such orders become delinquent based upon the Trust's guidelines; and

(xvi)   monitoring "as of's" and advising broker-dealers of the necessity to reimburse the Trust when the as of loss from a transaction exceeds the thresholds established by the Trust.

In addition to the above-listed services, BFDS was also required, pursuant to Section 4.H of the Transfer Agency Agreement, to "maintain a quality control process" concerning its provision of such services:  and, specifically, to provide "monthly report[s]" to the JPMC Trust measuring BFDS's "performance of the Services under this Agreement" as measured against agreed-upon "service level standards."

accounting services) and D (derivatives-related services). As Custodian, Chase provides the Funds with various custodial services – such as holding and maintaining each fund's securities and cash, transferring cash and securities in connection with fund investment transactions, maintaining the books of account and records of fund portfolio transactions. As Accounting Agent, Chase performs an array of further portfolio accounting, administrative, reporting and compliance services, set forth at Schedule C to the Custody/Accounting Agreement – including, among other things, preparing a substantial amount of the information reported to the Fund's shareholders, board, and the SEC.[2] The Custody/Accounting Agreement sets forth the fees payable to Chase for its provision of such services.

---

[2] Chase's "Fund Accounting Services" include, more specifically:
- NAV Calculation / Fund Valuation:
  - Standard transactional and NAV materiality thresholds
- Fund Pricing and Reporting
  - Standard valuation oversight reporting (e.g. Fair Value reports, Broker Prices, etc.)
- Capital Stock Processing and Reconciliation
  - Utilizing automated data files from Transfer Agent
  - Automated NAV transmissions to Transfer Agent
- Portfolio Trades Processing
  - Utilizing standard and automated inputs
- Corporate actions processing
- Portfolio Income Recognition
- Automated Expense Processing
- Rate Calculations for Daily Distributing Funds
- Cash Reconciliations (daily)
- Asset Reconciliations (weekly); Futures and Proprietary Fund of Funds daily
- NAV Dissemination
  - Utilizing Unity Performance / GraphNet (Related out-of-pocket fees charged to client)
- Audit Reporting and Coordination
  - External audit, SAS70, and client due diligence coordination
  - Monitor as of trading for 60 days during the Audit Period
  - Prepare Audit Confirms
- Standard Client Reporting
  - Standard End-of-Day Accounting Information
- Risk Oversight Reporting (e.g. Aged Receivables, Stale Prices, etc)
- Provide data for board reports and pricing committee materials
- Investment Manager / Sub-Advisor Reconciliation (3rd Party Recons) to extent applicable
- Provide short extension services for funds which operate a synthetic long/short investment strategy

*See* Custody/Accounting Agreement at Schedule C.

### c.  The Fund's Administrator

46.  Until April 1, 2016, JP Morgan Funds Management Inc., (hereinafter "JPMFM") served as Administrator for each of the funds in the JPMC Trust (and all the funds in the JPMC Fund Family), including the Fund, pursuant to an Administration Agreement dated February 19, 2005, as subsequently amended (the "Administration Agreement").[3]  JPMFM was merged with and into JPMIM effective April 1, 2016, at which point JPMIM succeeded JPMFM as administrator of the Fund (and all other funds in the JPMC Trust and in the JPMC Fund Family).

47.  As summarized in the JPMC Trust's SEC filings, as administrator, JPMFM was, and JPMIM is, required to "perform or supervise all operations of each fund" in the JPMC Fund Family, including the Fund, "other than those [operations] performed under the [IAA], any sub-advisory agreements, the [Custody/Accounting Agreement], and the [Transfer Agency Agreement]."  *See* JPMC Trust Statement of Additional Information, at p. 101.  Among other things, JPMFF used to, and JPMIM does, "maintain the necessary office space for the Funds," "prepare[] the annual and semi-annual reports to the SEC," "prepare federal and state tax returns," and "generally assist[] in all aspects of the Funds' operations other than those performed under [the above-mentioned IAA, Custody/Accounting Agreement and Transfer Agency Agreement]."  *Id.*

48.  Again, the list of services required of JPMIM (and before it, JPMFM) as Administrator is quite long.  *See* Administration Agreement at Section 2 generally and Sections 2(a)-(oo) specifically.[4] As set forth therein, the Administrator was responsible for:

---

[3] JPMFM was a Delaware corporation, affiliated with JPMIM and ultimately wholly-owned by JPMC, with its principal place of business located at 1111 Polaris Parkway, Columbus, Ohio 43240.
[4] Which state:

ARTICLE 2. ADMINISTRATIVE SERVICES. Subject to the direction and control of the Board of Trustees (or Directors) of the Trust ("Trustees"), the Administrator shall perform or supervise the performance by others of administrative services in connection with the operations of the Funds.

Without limiting the generality of the foregoing, the Administrator shall:

a.  Provide all necessary office facilities (which may be in the offices of the Administrator or an affiliate), equipment, and personnel for handling the affairs of the Funds;

b.  Subject to supervision by counsel to the Trust, prepare amendments to, file, and maintain the Trust's governing documents, including the Declaration of Trust (or charter as the case may be), the Bylaws, and minutes of meetings of shareholders;

c.  Provide individuals reasonably acceptable to the Trust's Trustees to serve as officers of the Trust, who will be responsible for the management of certain of the Trust's affairs as determined by the Trust's Trustees;

d.  Prepare agenda and prepare and compile board materials for all Trustee meetings and review, file, and maintain minutes of meetings of Trustees;

e.  Provide appropriate personnel for Board of Trustees meetings;

f.  Subject to supervision by counsel to the Trust, prepare, review and file the Trust's Registration Statement (on Form N-1A, Form N-14 or any replacements therefor), periodic supplements to the Registration Statement, proxy materials and other filings with the Commission;

g.  Subject to supervision by counsel to the Trust, prepare and file, or supervise the preparation and filing of, Form N-CSR and Form N-Q and provide any sub-certifications which may reasonably be requested by the Trust's Principal Executive Officer or Principal Financial Officer in connection with the required certification of those filings and coordinate receipt of similar sub-certifications from other service providers that provide information to be included in such filings;

h.  Prepare and file, or supervise the preparation and filing of, all necessary Blue Sky filings;

i.  Prepare and file, or supervise the preparation and filing of, annual Form N-PX;

j.  Arrange for and coordinate the layout and printing of prospectuses, statements of additional information, semi-annual and annual reports to shareholders, and proxy materials;

k.  Prepare, with the assistance of the Fund's investment adviser, and sub-adviser, as applicable, communications to shareholders;

l.  Coordinate the mailing of prospectuses, notices, proxy statements, proxies, semi-annual and annual reports to shareholders, and other reports to Trust shareholders, and supervise and facilitate the proxy solicitation process for all shareholder meetings, including the tabulation of shareholder votes;

m.  Prepare for and conduct shareholder meetings, if necessary;

n.  Assist with the design, development, and operation of Funds for the Trust, including new classes, investment objectives, policies and structure;

o.  Prepare semi-annual and annual financial statements;

p.  Prepare and file periodic reports to shareholders and the Commission on Form N-SAR or any replacement forms therefor;

q.  Prepare and file Notices to the Commission required pursuant to Rule 24f-2 of the 1940 Act;

r.  Compile data for, assist the Trust or its designee in the preparation of, and file, all of the Funds' federal and state tax returns and required tax filings other than those required to be made by the Trust's custodian and transfer agent

s.  Prepare and distribute year-end shareholder tax information letters and Forms 1099-MISC for trustee fees and vendor payments;

t.  Identify and track book-tax differences;

u.  Prepare quarterly tax compliance checklist for use by Fund managers;

v.  Calculate declaration of income/capital gain distributions in compliance with income/excise tax distribution requirements and ensure that such distributions are not "preferential" under the Internal Revenue Code;

w.  Review reports produced by, and the operations and performance of, the various organizations providing services to the Trust or any Fund of the Trust, including, without limitation, the Trust's investment adviser, custodian, sub-adviser, fund accountant, shareholder servicing agent, transfer agent, outside legal counsel, independent public accountants, and other entities providing services to the Trust, and at the request of the Trustees, report to the Trustees on the performance of such organizations;

19

a.      reporting to the Board (*see* Administration Agreement at Sections 2(d)-(e), (w), (kk));

b.      reporting to the SEC and preparing and filing SEC filings such as registration statements and annual and semi-annual reports (*id.*, Sections 2(f)-(j), (o)-(q)), and distributing such filings to Fund shareholders (*id.*, Sections 2(l)-(m));

---

| | |
|---|---|
| x. | Prepare, negotiate, and administer contracts on behalf of the Trust with, among others, the Trust's investment adviser, custodian, fund accountant, shareholder servicing agent, and transfer agent and oversee expense disbursement and any service provider conversions; |
| y. | Calculate contractual Trust expenses and control all disbursements for the Trust, and as appropriate compute the Trust's yields, total return, expense. ratios, portfolio turnover rate and, if required, portfolio average dollar weighted maturity; |
| z. | Prepare annual Trust expense budget and monthly accrual analyses, perform various expense savings analysis and expense benchmarking analysis; |
| aa. | Prepare expense authorizations and review or prepare for management review all invoices for Trust expenses; |
| bb. | Calculate performance data of the Funds for dissemination to information service providers covering the investment company industry; |
| cc. | Review marketing material to verify that Fund information is accurate; |
| dd. | Prepare and file proofs of claims in connection with Class Action notices; |
| ee. | Monitor the Trust's compliance with the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, so as to enable the Trust to maintain its status as a "regulated investment company;" |
| ff. | Monitor the Trust's compliance with all applicable federal securities and other regulatory requirements; |
| gg. | Monitor the Trust's compliance with its registration statement; |
| hh. | Obtain and keep in effect fidelity bonds and directors and officers/errors and omissions insurance policies for the Trust in accordance with the requirements of Rules 17g-1 and 17d-1(d)(7) under the 1940 Act as such bonds and policies are approved by the Trust's Trustees; |
| ii. | Provide information and assistance with inspections by the Commission; |
| jj. | Coordinate annual audit activities, including providing information and assistance with respect to audits conducted by the Trust's independent auditors; |
| kk. | Compile and summarize periodic Rule 2a-7 money market funds' analysis for Board of Trustee review; assist management with the administration of the trustees' deferred compensation plans, if any; |
| ll. | Design, implement and maintain a disaster recovery program for the Trust's records; |
| mm. | Assist the Trust's Chief Compliance Officer with issues regarding the Trust's compliance program (as approved by the Board of Trustees of the Trust in accordance with Rule 38a-1 under the 1940 Act) as reasonably requested; |
| nn. | Administer the implementation and required distribution of the Privacy Policy of the Trust as required under Regulation S-P; and |
| oo. | Perform all administrative services and functions of the Trust and each Fund to the extent administrative services and functions are not provided to the Trust or such Fund pursuant to the Trust's or such Fund's investment advisory agreement, custodian agreement, fund accounting agreement, shareholder servicing agreement, and transfer agent agreement. |

The Administrator shall perform such other administrative services for the Trust that are mutually agreed upon by the parties from time to time.

20

c.      communicating with and reporting to Fund shareholders (*id*., Sections 2(j)-(m)) and prospective shareholders (*id*., Section 2(cc));

d.      preparing semi-annual and annual financial statements (*id*., Section 2(o));

e.      preparing, reporting and filing taxes (*id*., Sections 2(r)-(v));

f.      monitoring and overseeing the performance of other service providers, and reporting on such performance to the Board (*id*., Sections 2(w)-(x));

g.      overseeing fund expenses (*id*., Sections 2(y)-(aa));

h.      compliance-related matters (*id*., Section 2(dd)-(ii), (mm)-(nn));

i.      coordinating annual audits (*id*., Sections 2(jj); and

j.      any and all other administrative services required but not already provided to the funds in JPMC Trust and/or JPMC Fund Family by the funds' investment adviser, custodian/accountant, transfer agent, and shareholder servicing agent (*id*., Sections 2(oo)).

49.     The Administration Agreement sets forth the fees separately payable to JPMIM (and, before JPMIM, to JPMFM) for provision of such services. *See* Administration Agreement at Section 5 and Schedule B.

### d.  The Fund's Distributor and Shareholder Servicing Agent

50.     J.P. Morgan Distribution Services, Inc. ("JPMDS") serves as Distributor for each Fund in the JPMC Trust (and all funds in the JPMC Fund Family), including the Fund, pursuant to a Distribution Agreement between JPMDS and the JPMC Trust, which confers on JPMDS the right to solicit and accept orders for the purchase of fund shares.  Different fund share classes pay different distribution fees, ranging from 0.25% to 0.75% of average daily assets.

51.     JPMDS also provides each Fund in the JPMC Trust (and all funds in the JPMC Fund Family), including the Fund, with certain "Shareholder Services"  and "Other Related

Services" pursuant to a shareholder servicing agreement between the JPMC Trust and JPMDS dated February 19, 2005 (the "Shareholder Servicing Agreement").

52.     The Shareholder Services provided by JPMDS pursuant to Section 2.2 of the Shareholder Servicing Agreement include:

      a.     answering shareholder inquiries (through electronic and other means) regarding account status and history, the manner in which purchases and redemptions of the shares may be effected and certain other matters pertaining to the Trust;

      b.     providing shareholders with information through electronic means;

      c.     assisting shareholders in completing application forms, designating and changing dividend options, account designations and addresses;

      d.     arranging for or assisting shareholders with respect to the wiring of the funds to and from shareholder accounts in connection with shareholder orders to purchase, redeem or exchange shares;

      e.     verifying shareholder requests for changes to account information;

      f.     handling correspondence from shareholders about their accounts;

      g.     assisting in establishing and maintaining shareholder accounts with the Trust; and

      h.     providing such other shareholder services as the JPMC Trust or a shareholder may reasonably request, to the extent permitted by applicable law.

53.     The above-detailed Shareholder Services task JPMDS with most direct 'one-to-one' communications with fund shareholders, and thus make JPMDS the primary direct contact for Fund shareholders who have inquiries concerning their funds or their mutual funds.

54.     The Other Related Services provided by JPMDS pursuant to Section 2.3 of the Shareholder Servicing Agreement include:

      a.     aggregating and processing purchase and redemption orders for shares;

      b.     providing shareholders with account statements showing their purchases, sales, and positions in the applicable mutual fund;

      c.     processing dividend payments for the applicable mutual fund;

      d.     providing sub-accounting services to the JPMC Trust for shares held for the benefit of shareholders;

      e.     forwarding communications from the JPMC Trust to shareholders, including proxy statements and proxy solicitation materials, shareholder reports, dividend and tax notices, and updated Prospectuses and Statements of Additional Information;

      f.     receiving, tabulating and transmitting proxies executed by shareholders;

      g.     facilitating the transmission and receipt of funds in connection with shareholder orders to purchase, redeem or exchange shares;

      h.     developing and maintaining JPMC Trust's website;

      i.     developing and maintain facilities to enable transmission of share transactions by electronic and non-electronic means;

      j.     providing support and related services to financial intermediaries in order to facilitate their processing of orders and communications with shareholders;

      k.     providing transmission and other functionalities for shares included in investment, retirement, asset allocation, cash management or sweep programs or similar programs or services; and

      l.     developing and maintaining check writing functionality

55.     The Shareholder Servicing Agreement sets forth the fees payable to JPMDS for its provision of such Shareholder Services and Other Related Services at Section 3 and Schedule B thereto.

### 3.      The Fund's Board of Trustees

56.     Finally, a Board of Trustees (hereinafter, the "Board") oversees the Fund.  The same Board, in fact, oversees each of the funds in the JPMC Trust.  Among the Board's primary duties is to monitor and oversee the Fund's service providers, including JPMIM, BFDS, Chase and JPMDS, and to annually evaluate, review and approve (or not) the agreements with and fees payable to these JPMIM.  Section VII.F *infra* further details the Board's evaluation and approval of the IAA and of the advisory fee rates payable to JPMIM.

## VI.   THE SERVICES JPMIM PROVIDED, AND THE FEES JPMIM CHARGED, TO THE FUND

### A.     The Investment Advisory Services Provided by JPMIM to the Fund

57.     The IAA sets forth the investment advisory services that JPMIM is required to provide to the Fund *in its capacity as the Fund's investment adviser*, and/or pursuant to the IAA. *See* IAA at Section 2.  (As detailed in Section V.B.2.c, *supra*, JPMIM also provides, *separately*, extensive administrative services to the Fund, in its capacity as the Fund's Administrator and pursuant to the Administration Agreement, for which services JPMIM is separately and additionally compensated).

a.      In primary and largest part, the IAA requires JPMIM to research potential investments for the Fund, and decide which securities to purchase for or sell from the Fund's investment portfolio, at which times and in which amounts.  Such services are referred to herein as "Portfolio Selection Services."

b.      In much smaller part, JPMIM also provides certain further services to the Fund in its capacity as the Fund's investment adviser and/or pursuant to the IAA, which boil down to: (1) minor administrative- and compliance-related services (including maintaining books and records for the Fund with respect to JPMIM's provision of Portfolio Selection Services); and (2) periodic reporting to the Fund's shareholders and the Fund's Board (again, largely concerning JPMIM's provision of Portfolio Selection Services).  *See e.g.* IAA at Section 2(e). Such further services are referred to herein as "Other Services."

### 1.      Portfolio Selection Services

58.      The services required of JPMIM pursuant to the IAA, set forth in Section 2 of the IAA, are primarily Portfolio Selection Services:

> 2. **Subject to the general supervision of the Trustees of the Trust, the Advisor shall manage the investment operations of each Portfolio and the composition of the Portfolio's holdings of securities and investments, including cash, the purchase, retention and disposition thereof and agreements relating thereto, in accordance with the Portfolio's investment objectives and policies** as stated in the Trust's registration statement on Form N-1A, as such may be amended from time to time (the "Registration Statement"), with respect to the Portfolio, under the Investment Company Act of 1940, as amended (the "1940 Act"), and subject to the following understandings:
>
> (a) **the Advisor shall furnish a continuous investment program for each Portfolio and determine from time to time what investments or securities will be purchased, retained, sold or lent by the Portfolio, and what portion of the assets will be invested or held uninvested as cash**;
>
> (b) the Advisor shall use the same skill and care in the management of each Portfolio's investments as it uses in the administration of other accounts for which it has investment responsibility as agent;
>
> (c) the Advisor, in the performance of its duties and obligations under this Agreement, shall act in conformity with the Trust's Declaration of Trust (such Declaration of Trust, as presently in effect and as amended from time to time, is herein called the

"Declaration of Trust"), the Trust's By-Laws (such By-Laws, as presently in effect and as amended from time to time, are herein called the "By-Laws") and the Registration Statement and with the instructions and directions of the Trustees of the Trust and will conform to and comply with the requirements of the 1940 Act and all other applicable federal and state laws and regulations;

(d) **the Advisor shall determine the securities to be purchased, sold or lent by each Portfolio and as agent for the Portfolio will effect portfolio transactions pursuant to its determinations either directly with the issuer or with any broker and/or dealer in such securities**; in placing orders with brokers and/or dealers the Advisor intends to seek best price and execution for purchases and sales; the Advisor shall also determine whether the Portfolio shall enter into repurchase or reverse repurchase agreements;

On occasions when the Advisor deems the purchase or sale of a security to be in the best interest of one of the Portfolios as well as other customers of the Advisor, including any other of the Portfolios, the Advisor may, to the extent permitted by applicable laws and regulations, but shall not be obligated to, aggregate the securities to be so sold or purchased in order to obtain best execution, including lower brokerage commissions, if applicable. In such event, allocation of the securities so purchased or sold, as well as the expenses incurred in the transaction, will be made by the Advisor in the manner it considers to be the most equitable and consistent with its fiduciary obligations to the Portfolio;

(e) the Advisor shall maintain books and records with respect to each Portfolio's securities transactions and shall render to the Trust's Trustees such periodic and special reports as the Trustees may reasonably request . . .

*See* IAA at Section 2 (emphasis added).

59.   The Fund's various SEC filings also discuss JPMIM's role as the Fund's investment adviser, the services provided by JPMIM in such role, and JPMIM's performance of such services.   Such discussions, focusing in effective entirety on JPMIM's provision of Portfolio Selection Services, provide further detail concerning the Portfolio Selection Services provided, including:

a. the "Investment Objective" that JPMIM pursues for the Fund – *i.e.*, the

*end* which JPMIM's Portfolio Selection Services endeavor to achieve;

b. the "Principal Investment Strategies" employed by JPMIM for the Fund –

*i.e.*, the particular means used by JPMIM to reach the stated investment objective; and

c. further details concerning how, and by whom, the Fund's principal

investment strategies are developed and implemented for the Fund.

### a. The Investment Objective Pursued by JPMIM for the Fund

60. The Fund's stated investment objective is:

> to provide a high total return from a portfolio of selected equity
> securities.

*See* November 1, 2016 Fund Prospectus, at 85.

### b. The Principal Investment Strategies Employed by JPMIM for the Fund

61. JPMIM seeks to fulfill the Fund's stated investment objective by employing a set

of "principal investment strategies" that govern the evaluation, selection, acquisition and

disposition of investment securities for the Fund's investment portfolio.    These principal

investment strategies, as set forth in the Fund's Prospectus, are:

**What are the Fund's main investment strategies?**

Under normal circumstances, at least 80% of the value of the
Fund's Assets, which are expected to include both long and short
positions, will consist of different U.S. securities, selected from a
universe of publicly traded large capitalization securities with
characteristics similar to those comprising the Russell 1000 and the
S&P 500 Indices. The Fund takes long and short positions mainly
in equity securities and derivatives on equity securities. . .

"Plus" in the Fund's name refers to the additional return the Fund
endeavors to add both relative to the S&P 500 Index as well as
relative to traditional strategies which do not have the ability to sell
stock short. Selling stock short allows the Fund to more fully
exploit insights in stocks that the Fund's adviser expects to

underperform, as well as enabling the Fund to establish additional long positions while keeping the Fund's net exposure to the market at a level similar to a traditional "long-only" strategy. Short sales involve the sale of a security which the fund does not own in hopes of purchasing the same security at a later date at a lower price. To make delivery to the buyer, the Fund must borrow the security, and the fund is obligated to return the security to the lender, which is accomplished by a later purchase of the security by the Fund. The Fund may also periodically short index futures in order to hedge its market exposure in instances when it is not preferable to enter into short positions on particular securities in the amount desired.

The Fund intends to maintain an approximate net 100% long exposure to the equity market (long market value minus short market value). However the long and short positions held by the Fund will vary in size as market opportunities change. The Fund's long positions and their equivalents will range between 90% and 150% of the value of the Fund's net assets. The Fund's short positions will range between 0% and 50% of the value of the Fund's net assets.

*See* November 1, 2016 Prospectus, at 86.

62.     Distilling the above-quoted narrative description provided into the Prospectus into salient constituent parts, the Fund's investment strategies include:

    a.     an asset-class focus on equities (and derivatives on equities);

    b.     a geographic focus on U.S. equities (which must constitute at least 80% of the Fund's portfolio):

    c.     a market-capitalization focus on large-capitalization ("large cap") securities;

    d.     no prioritization of either "value" or "growth" investment styles, resulting in a "blend" of value and growth positions;[5] and

----

[5] Fund marketing materials authored by JPMIM and its affiliates note the Fund's "unbiased approach to growth and value styles . . .". *See* "Fund Story" marketing presentation, available at https://am.jpmorgan.com/blob-gim/1383322043946/83456/4Q16-STO-USLCCP.pdf?segment=AMERICAS_US_ADV&locale=en_US.

e.      the ability not only to make usual "long" investments, but also to make, in lesser degree, "short" investments by selling stock short or employing derivatives to achieve similar ends, within the following parameters:

i)      maintaining Fund net assets (market value of long positions minus market value of short positions) at approximately a 100% net long position; while

ii)      allowing short exposures to range from as little as 0% to as much as 50%, of Fund net assets; and

iii)      allowing long exposures to range from as little as 90% to as much as 150%, of Fund net assets.

63.      While the strategies set forth in ¶ 62 (a)-(d) *supra* are quite common, the ability to take short positions as well as long ones, as set forth in ¶ 62 (e) *supra*, is less common.  Funds employing such strategies are often termed "130/30" funds – *i.e.*, funds that take long exposures of 130% of fund net assets, offset by short exposures equaling 30% of fund net assets.  Indeed, the webpage maintained by JPMIM and its affiliates for the Fund describes the Fund as having a "130/30 strategy," as do Fund marketing materials authored by JPMIM and its affiliates.[6]

**c.  The Investment Process Employed by JPMIM for the Fund**

64.      Fund SEC filings provide further disclosure on the "investment process" utilized by JPMIM in implementing the above-described principal investment strategies to pursue the Fund's investment objectives:

---

[6] *See* https://am.jpmorgan.com/us/en/asset-management/gim/adv/products/d/jpmorgan-u-s-large-cap-core-plus-fund-a-4812a2413##Fees ("Through its 130/30 strategy, the [Fund] aims to maximize portfolio managers' insights and provide investors with greater return potential than traditional long-only strategies.").  *See also* the "Fund Story" marketing materials for the Fund, available at https://am.jpmorgan.com/blob-gim/1383322043946/83456/4Q16-STO-USLCCP.pdf?segment=AMERICAS_US_ADV&locale=en_US, which assert that "[t]he Fund's 130/30 strategy allows portfolio managers to act on both positive and negative stock views in an effort to increase portfolio returns."

*Investment Process*: In managing the Fund, the adviser employs a three-step process that combines research, valuation and stock selection. The adviser takes an in-depth look at company prospects over a period as long as five years which is designed to provide insight into a company's real growth potential. The research findings allow the adviser to rank the companies in each sector group according to their relative value.

On behalf of the Fund, the adviser buys and sells, as well as shorts and covers shorts in, equity securities and derivatives on those securities according to its own policies, using the research and valuation rankings as a basis. In general, the adviser buys and covers shorts in equity securities that are identified as undervalued and considers selling or shorting them when they appear overvalued. Along with attractive valuation, the adviser often considers a number of other criteria such as:

• catalysts that could trigger a rise in a stock's price

• high potential reward compared to potential risk

• temporary mispricings caused by apparent market overreactions.

*See* Fund November 1, 2016 Prospectus, at 86-87.

### d. The JPMIM Portfolio Managers Responsible for Managing the Fund

65.     Fund SEC filings also provide further disclosure on the "who" – the specific JPMIM personnel in charge of managing the Fund's investments ("portfolio managers").

66.     At all times from 2005 through 2015, as the Fund's net assets skyrocketed from below $1 billion to exceed $10 billion, the Fund's investments were in the charge of two JPMIM portfolio managers:  Thomas Luddy and Susan Bao.  In 2016, a third portfolio manager, Scott Davis, was added.  Each of the Fund's portfolio managers is a managing director of JPMIM, and each has day to day management responsibility for a portion of the Fund.

67.     As further detailed in Fund marketing materials, the Fund's three portfolio managers, in managing the Fund's investments, utilize "research ideas [from] at team of 27

career research analysts."[7]  As further detailed below, this team of research analysts is not Fund-specific, but instead is utilized by and supports the portfolio managers of many other funds in the JPMC Fund Family.

## 2. Other Services

68.    As set forth in Section V.B.2, *supra*, most of the further services required for the Fund's operation, over and above Portfolio Selection Services provided by JPMIM, are provided by a variety of other service providers (*e.g.*, BFDS, Chase, JPMDS) pursuant to separate service contracts (*e.g.*, the Transfer Agency Agreement, the Custody/Accounting Agreement, the Shareholder Servicing Agreement) and in exchange for separate fee streams, or were otherwise procured by the Fund for separate compensation.  Indeed, as set forth in Section V.B.2.c, *supra*, the Fund separately procures an extensive array of administrative services from JPMIM itself, in JPMIM's capacity as Fund administrator and pursuant to the Administration Agreement, for which services JPMIM is separately compensated.

69.    However, the IAA specifies two additional services required of JPMIM as the Fund's investment adviser, over and above JPMIM's Portfolio Selection Services.  Specifically, as set forth in Section 2(e) of the IAA:

> [T]he Advisor shall maintain books and records with respect to each Portfolio's securities transactions and shall render to the Trust's Trustees such periodic and special reports as the Trustees may reasonably request[.]

70.    The Fund's SEC various SEC filings also discuss JPMIM's role as the Fund's investment adviser, the services provided by JPMIM in such role, and JPMIM's performance of such services.  Although such discussions focus overwhelmingly on JPMIM's provision of

---

[7] *See* "Fund Story" presentation, at 2, available at: https://am.jpmorgan.com/blob-gim/1383322043946/83456/4Q16-STO-USLCCP.pdf.

Portfolio Selection Services, the Fee Approval Summaries contained in the Fund's semi-annual reports (detailed in Section VII.F, *infra*), when read very closely, also indicate that JPMIM also had to provide certain compliance-related services.  However, close reading of the Fund's other service contracts indicates that other service providers in fact provided the lion's share of compliance-related services.  *See* Section V.B.2, *supra*.

71.     Thus, to the extent specified in the IAA and/or disclosed in the Fund's SEC filings, the Other Services thus boil down to: (1) very minor administrative services (maintaining books and records with respect to securities transactions); (2) minor compliance-related services; and (3) reporting to the Fund's Board.

**B.     The Advisory Fee Rates Charged by JPMIM and the Advisory Fees Paid by the Fund**

**1.     The Advisory Rate Charged to the Fund by JPMIM**

72.     The IAA requires the Fund to pay to JPMIM, as compensation for JPMIM's provision of investment advisory services, an investment advisory fee at annualized fee rates, detailed below, that are computed and accrued on a daily basis and paid monthly.

73.     The Fund's operative, annualized advisory fee rate, set forth in Schedule A of the IAA, is 0.80% of the Fund's average daily net assets.  This fee rate has been operative at all times during the year prior to the filing of this action.

74.     The Fund's fee rate does not include any fee breakpoints (progressively lower fee rates assessed on progressively higher ranges of Fund net assets), but instead assess a uniform 0.80% rate against *all* Fund net assets.

**2.     The Fee Waiver Agreement**

75.     JPMIM, as investment adviser and administrator to the JPMC Fund Family funds in the JPMC Trust, and JPMDS, as distributor and shareholder servicing agent to the JPMC Fund

Family funds in the JPMC Trust, have also entered into fee waiver agreements with the JPMC Trust with respect to certain JPMC Fund Family funds, including the Fund (the "Fee Waiver Agreement").

76.     The Fee Waiver Agreement:

a.     sets forth certain caps on the Fund's total expense ratio (the sum of *all* Fund fees and operating expenses, divided by Fund net assets); and,

b.     requires JPMIM and JPMDS, should Fund total expense ratios exceed such caps, to "waive" fees otherwise owed them – specifically, investment advisory fees, administration fees, and shareholder servicing fees – in an amount sufficient to reduce the Fund's total expense ratio so that it no longer exceeds the cap. However, in the event that total expense ratios exceeds such total expense ratio caps, the Fee Waiver Agreement does not contain any provision concerning which fees should be waived in which amounts (*i.e.*, any allocation principle). Consequently, the specific allocation of any such requisite fee waivers among the various fees subject to these caps (investment advisory fees, administrative fees, shareholder servicing fees) appears to be left to the discretion of JPMIM and JPMDS.

77.     The Fee Waiver's total expense ratio caps with respect to the Fund are:  1.25% with respect to Class A shares; 1.75% for Class C shares, 1.50% for Class R2 shares; 0.80% for Class R5 shares; and 0.99% for Select Class shares.

78.     During the most recent period for which relevant information is available – the six months ended December 31, 2016 – JPMIM and JPMDS waived $9.073 million in fees otherwise owed to them by the Fund, namely:

a.     $1.502 million of shareholder servicing fees otherwise payable to JPMDS;

b.    $3.029 million of administration fees otherwise payable to JPMIM (as Administrator);

c.    $4.542 million of investment advisory fees otherwise payable to JPMIM (as investment adviser).

79.    In the analyses performed below, advisory fee rates and advisory fees are presented both pre- and post-Fee Waiver.

### 3.    The Advisory Fees Paid by the Fund

80.    To the extent that Section 36(b) provides a damages limitation 'start date' (but no corresponding end date), damages are limited to only those excessive fees charged during the period *beginning* one year prior to the complaint filing (but extending through the pendency of the action).

81.    The Fund has yet to disclose information on the advisory fees paid for certain portions of this one year period prior to complaint filing.   Nevertheless, based on relevant information the Fund *has* disclosed, some portion of those fees are already known.

82.    The Fund operates on a fiscal year that ends on June 30 of each year.  Typically, the Fund's semi-annual reports (for the six month period ended December 31 of each year) and annual reports (for the twelve month period ended June 30 of each year), which contain *inter alia* the Fund's audited financial statements, are filed with the SEC approximately two months after the close of the respective semi-annual and annual periods. Consequently, the investment advisory fees paid by the Fund during the first six months of 2017 – which give rise to part of the damages here – will not be disclosed until approximately early September 2017.

83.    The Fund's most-recently disclosed investment advisory fee payments are for the six month period beginning July 1, 2016 ended December 31, 2016 – a period entirely within the relevant damages period here.  During that six month period, the Fund paid JPMIM $39.74

million in advisory fees pursuant to, and at, the IAA's 0.80% annualized advisory fee rate. However, pursuant to the Fee Waiver, JPMIM "waived" $4.542 million of such otherwise-payable advisory fees.

84.   **JPMIM EXTRACTED EXCESSIVE FEES FROM THE FUND**

Since the ICA was amended through Section 36(b), judicial standards have evolved to determine whether or not investment advisory fees were excessive and/or breached fiduciary duties.  These standards, known as the "*Gartenberg* factors," are addressed *seriatim* below.

A.   **Comparative Fee Structures**

85.   The investment advisory fee rates paid that JPMIM charged to the Fund are **aptly** compared to:

a.   the investment advisory fee rates that JPMIM offered to *other JPMIM advisory clients* for investment advisory services *substantially similar and in large part identical to those JPMIM provided to the Fund* (*see* Section VII.A.1, *infra*), including:

i)   the lower investment advisory fee rates charged by JPMIM to another mutual fund in the JPMC Fund Family, the JPMorgan U.S. Equity Fund (the "JPM Equity Fund"), to whom, as detailed below and in Exhibit A, JPMIM provided substantially similar and in large part identical investment advisory services as those provided to the Fund;

ii)   the lower fee rates charged by JPMIM fees for serving as sub-adviser to the PSF Long/Short Large Cap portfolio of the PSF Select Fund (the "Subadvised PSF Fund"), in which capacity, as detailed below and in Exhibits A and B, JPMIM provided

35

substantially similar and in large part identical investment advisory

services as those it provided to the Fund; and

b.      the investment advisory fee rates paid by other mutual funds whose size,

character and investment strategy are comparable to the Fund (*see* Section VII.A.2 and, *infra*,

and Exhibits C1 and C2 hereto).

86.      Such apt comparisons uniformly indicate that the Fund paid substantially *higher*

fees for substantially *similar* investment advisory services – as the Board itself acknowledged in

conducting similar comparisons (*see* Section VII.F.3.a, *infra*).

87.      In light of the similarity of services provided (which makes such fee comparisons

apt) and the dissimilarity in the fees charged, the Fund's higher advisory fees do not arise from

and cannot be explained by any purportedly greater or additional investment advisory services

that JPMIM provides to the Fund (*i.e.*, services purportedly *not* provided to JPMIM's other

clients and/or to other similar mutual funds).

## 1.      JPMIM Provided its Other Clients with Substantially Similar Investment Advisory Services at Substantially Lower Advisory Fee Rates

88.      Exhibits A and B hereto gather and present comparative data concerning the

services JPMIM provided and the fees JPMIM charged to three different clients – (1) the Fund;

(2) the JPM Equity Fund; and (3) the PSF Subadvised Fund – extracted from SEC filings (and

exhibits thereto, such as the relevant investment advisory agreements and/or investment

subadvisory agreements) for each of the above-mentioned funds.[8] Such data includes, for each of

the three JPMIM fund clients:

---

[8] Exhibit A presents all this data *except for* the services provided by JPMIM to the PSF Subadvised Fund – which are so extensive (as detailed below at Section VII.A.1.b, *infra*) that they do not fit into Exhibit A's available space. These services are therefore separately detailed in Exhibit B, which consists of JPMIM's subadvisory agreement with the PSF Subadvised Fund, as amended.  *See* Ex. B at Section 2(a)-(x).

a.      the funds' organization;

b.      the funds' investment adviser and/or sub-adviser (or, stated differently, JPMIM's role as either investment adviser or investment sub-adviser);

c.      the advisory and/or sub-advisory services required by operative advisory and sub-advisory contracts for the funds;

d.      the advisory and/or sub-advisory fees JPMIM charged;

e.      the funds' investment objectives;

f.      the funds' principal investment strategies;

g.      the particular JPMIM personnel identified as the funds' "portfolio managers";

h.      extensive and particularized information concerning the investment portfolios JPMIM provided and managed for such clients – *i.e.*, particularized and concrete factual detail concerning the *actual investment advisory services JPMIM performed* – including data concerning:

i)      the ten largest stock holdings, as of particular dates;

ii)     the total number of different stock holdings, as of particular dates;

iii)    sector allocations of the portfolios (*e.g.*, X% in the financial sector, Y% in the industrial sector, etc.);

i.      the funds' performance; and

j.      the funds' size.

### a.  Comparison to the JPM Equity Fund

89.    With respect to the JPM Equity Fund, as compared to the Fund, Exhibit A shows:

a.      that the JPM Equity Fund was housed in the *same* registered investment company – the JPMC Trust – as the Fund.  As such, the JPM Equity Fund and the Fund were

served by *identical* service providers – JPMIM, BFDS, Chase, JPMDS – in *identical* capacities (respectively:  investment adviser and administrator, transfer agent, custodian and accounting agent, and distributor and shareholder servicing agent) pursuant to the *same* service contracts (respectively: the IAA and the Administration Agreement; the Transfer Agency Agreement; the Custody/Accounting Agreement; and the Shareholder Servicing Agreement).

        b.     that the JPM Equity Fund and the Fund had the same investment adviser, JPMIM – and, moreover, *the same IAA*, setting forth the same set of investment advisory services that JPMIM was obligated to provide as investment adviser, namely Portfolio Selection Services and a modicum of Other Services;

        c.     that the JPM Equity Fund and the Fund had identical investment objectives ("to provide high total return from a portfolio of selected equity securities");

        d.     that the JPM Equity Fund and the Fund had near-identical principal investment strategies, including:

        i)     a shared asset class focus on equities;

        ii)     a shared geographic focus on the U.S., with a shared restriction that at least 80% of each funds' portfolio consist of U.S. securities;

        iii)     a shared market capitalization focus on large capitalization stocks (although the JPM Equity Fund could also invest in medium capitalization ["mid-cap"] stocks);[9]

        iv)     a shared effort to match fund sector allocations to the S&P 500 Index's sector allocations;

---

[9] Notwithstanding the JPM Equity Fund's *ability* to invest in mid-cap stocks, the JPM Equity Fund as a *practical matter* invested largely in large-cap stocks, and thus acted and looked like a large cap fund.  Indeed, it was classified as "large cap" stock fund by independent mutual fund data providers including Morningstar, Lipper and Bloomberg.

38

        v)      a shared investment style that was largely agnostic to, and in effect blended, "growth" and "value" styles; and

        vi)     a shared investment process (the one set forth in ¶64, *supra*).

In fact, the major and only real difference between the funds' principal investment strategies – and as further detailed below, between the funds themselves – was that JPM Equity Fund was limited to making long investments, while the Fund was able to make short investments as well (through a 130/30 strategy that aimed to maintain a net 100% long strategy).

      e.    that the JPM Equity Fund:

        i)      was managed by the same three JPMIM portfolio managers that managed the Fund (Thomas Luddy, Susan Bao and Scott Davis) as well as by one additional portfolio manager (David Small); and

        ii)     harnessed "research ideas" from the same "team of 27 career analysts" that provided research ideas to the Fund's portfolio managers;[10]

      f.    that, and unsurprisingly given the above-detailed similarities in the management, objectives and strategies of the funds, JPMIM provided the Fund and the JPM Equity Fund with substantially similar and in many respects identical investment portfolios, evident at both at the macro level of overall portfolio sector allocations and the micro level of individual stock selections.

        i)      For example, the portfolios of the Fund and the JPM Equity Fund featured effectively identical sector allocations:

---

[10] Compare "Fund Story" marketing materials for the Fund and the JPM Equity Fund, at 2, available respectively at https://am.jpmorgan.com/blob-gim/1383322043946/83456/4Q16-STO-USLCCP.pdf  and https://am.jpmorgan.com/blob-gim/1383322043534/83456/4Q16-STOUSE.pdf?segment=AMERICAS_US_ADV&locale=en_US.

| Sector | Percentage of Portfolio (Fund / JPM Equity Fund) |
|---|---|
| Information Technology | 20.3% / 20.8% |
| Financials | 17.2% / 15.5% |
| Consumer Discretion | 15.9% / 15.5% |
| Health Care | 14.4% / 15.2% |
| Industrial | 9.7% / 9.6% |
| Consumer Staples | 6.5% / 7.0% |
| Materials | 3.2% / 3.0% |
| Utilities | 2.3% / 2.7% |
| Telecommunications | 2.0% / 2/0% |

   ii) Likewise, at a more micro level, JPMIM provided the Fund and the JPM Equity Fund with largely similar and often identical investment selections, as evidenced by the below data (extracted from the funds' "top ten" holding disclosures) showing that seven of the Fund's top ten long holdings also numbered among the top ten holdings of the JPM Equity Fund, most often with near-identical portfolio weight:

| Equity Holding | Percentage of Portfolio (Fund / JPM Equity Fund) |
|---|---|
| Chubb | 2.6% / 2.0% |
| Microsoft | 2.5% / 2.4% |
| Wells Fargo | 2.3% / 2.5% |
| Broadcom | 2.3% / 2.0% |
| Lowe's | 2.3% / 2.2% |
| Alphabet | 2.0% / 1.9% |
| Pfizer | 2.0% / 1.9% |

   iii) Similarly, the number of different long positions provided by JPMIM to the two funds was largely similar:  as of June 30, 2016, the Fund had 179 long positions and the JPM Equity Fund 169; as

40

of December 31, 2015, the Fund had 201 long positions and the JPM Equity Fund 192.

g.      that, with largely the same managers employing largely the same strategies and mostly selecting the same stocks, the Fund and the JPM Equity Fund performed similarly.  For example, for the year ending June 30, 2016, the Fund had a 2.65% loss and the JPM Equity Fund a 1.50% loss.

90.     The foregoing allegations indicate that the JPM Equity Fund is, in effect, the Fund minus the Fund's short investment strategy and short investments.  Or, put alternatively, that the Fund and the JPM Equity Fund are substantially similar and largely identical on the "long" side, and that the Fund's additional short strategy and investments introduce and account for effectively all of the difference between the Fund and the JPM Equity Fund.

91.     Notwithstanding the substantial similarities in the investment advisory services that JPMIM provided to the Fund and the JPM Equity Fund, the investment advisory fees that JPMIM charges to the two funds are sharply different.  The Fund's advisory fee, 0.80%, is 100% greater than the JPM Equity Fund's advisory fee, 0.40%.

92.     The difference in services provided – *i.e.*, the Fund's additional short strategy, and the short positions constituting the implementation of such additional strategy – cannot explain and does not justify this 100% mark-up in advisory fees. (And nor can any economies of scale generated by the JPM Equity Fund's slightly larger size – $12 billion+, versus the Fund's nearly $10 billion, because JPMIM's fee rates for both funds feature no breakpoints that proffer lower rates at higher asset levels).

93.     The fee differential is all the more inexplicable and unjustifiable in light of the fact that providing investment advisory services to the JPM Equity Fund – which uses the same

41

team of JPMIM research analysts as the Fund, but which also uses one further portfolio manager over and above the three it shares with the Fund – is therefore *more costly* for JPMIM than providing investment advisory services to the Fund (which uses fewer portfolio managers). Notwithstanding JPMIM's higher costs to provide advisory services to the JPM Equity Fund, the advisory fee rates that JPMIM charges to the JPM Equity Fund (0.40%) – which allow JPMIM to provide such services at a profit – are half the level of the rates that JPMIM charges to the Fund.

94.     Consequently, such comparison indicates that advisory fee rates that JPMIM extracts from the Fund no longer bear any reasonable relationship to JPMIM's cost to provide such services.  The Fund, for which JPMIM charges fee rates twice as high (as the JPM Equity Fund) but which costs JPMIM less to provision with advisory services, allows JPMIM to reap highly abnormal and excessive profits.

### b.  Comparison to the PSF Subadvised Fund

95.     Pacific Select Fund is a registered investment company, like the JPMC Trust, housing within it multiple funds or portfolios.  Each of the funds or portfolios existing as series of the Pacific Select Fund is advised by Pacific Select Fund's investment adviser, Pacific Life Fund Advisors LLC ("PLFA").  For most of those funds or portfolios, including the Pacific Select Fund Long/Short Large-Cap Portfolio (the "PSF Subadvised Fund"), PLFA retained sub-advisers to provide such funds or portfolios with certain sub-advisory services, as further detailed below.  PLFA retained JPMIM to provide sub-advisory services in connection with the PSF Subadvised Fund.

96.     Detailed below is comparison of the services JPMIM provided (1) as the Fund's adviser and (2) as the PSF Subadvised Fund's subadviser, and of the fee rates JPMIM charged for providing such services.  Notwithstanding surface-level distinctions in nomenclature (advisory services versus subadvisory services), substantive examination of the services actually

42

required and actually provided – as set forth below – shows that the services provided were substantially similar, and in largest part effectively identical.

97.     With respect to the PSF Subadvised Fund, as compared to the Fund, Exhibits A and B show:

        a.     that JPMIM acted as investment adviser to the Fund and "portfolio manager" or subadviser (hereinafter, "subadviser") to the PSF Subadvised Fund;

        b.     that the Portfolio Management Agreement between PFLA and JPMIM (the "PMA," attached Ex. B hereto), setting forth the services required of JPMIM as subadviser for the PSF Subadvised Fund, required JPMIM to perform not only Portfolio Selection Services (that, as detailed below in ¶ 97(c)-(g) below, were *identical in general scope and exact application* to the Portfolio Selection Services that JPMIM provided to the Fund), but also an imposing array of Other Services (including administrative, compliance and reporting-related services) far *more extensive* than the Other Services required of JPMIM by the IAA (*see* Ex. B).

        This fact bears emphasizing.  The long list of services required of JPMIM as the PSF Subadvised Fund's subadviser, which extends over the course of seven and half pages and 29 sub-clauses in the PMA (*see* Ex. B. at Clauses 2(a)-(cc) and pp. 2-9, 45-46), makes full quotation here prohibitive.  Summarized, however, it requires JPMIM to provide:

        i)     exactly the same sort of Portfolio Selection Services as JPMIM provided to the Fund under the IAA (namely, researching potential investments, managing the portfolio, and effecting securities transactions):

2. Portfolio Manager Duties. Subject to the supervision of the Fund's Board of Trustees (the "Board") and the Investment Adviser, the Portfolio Manager will provide a continuous investment program for the Portfolio or a Segment of a Portfolio

and determine the composition of the assets of the Segment or Portfolio. The Portfolio Manager will provide investment research and analysis, which may include computerized investment methodology, and will conduct a continuous program of evaluation, investment, sales, and reinvestment of the Portfolio's assets by determining the securities, cash and other investments, including futures and options contracts, if any, that shall be purchased, entered into, retained, sold, closed, or exchanged for the Portfolio, when these transactions should be executed, and what portion of the assets of the Portfolio should be held in the various securities and other investments in which it may invest, and the Portfolio Manager is hereby authorized to execute and perform such services on behalf of the Portfolio. . .

*** 

(c) is responsible, in connection with its responsibilities under this Section 2, for decisions to buy and sell securities and other investments for the Segment or Portfolio, for broker-dealer and futures commission merchant ("FCM") selection, and for negotiation of commission rates. The Portfolio Manager's primary consideration in effecting a security or other transaction will be to obtain the best execution for the Portfolio, taking into account such factors as price (including the applicable commission or dollar spread), size of the order, the nature of the market for the security, the timing of the transaction, the reputation, experience and financial stability of the broker — dealer involved, the quality of the service, the difficulty of execution and theoperational facilities of the firms involved, and the firm's risk in positioning a block of securities and other such factors that are consistent with the objective of obtaining best execution . . .

See Ex. B (PMA), at pp. 2-3, and compare to IAA (as quoted above at ¶ 58).

       ii)       an imposing array of Other Services, including administrative (*see* PMA at Sections 2(e), (f), (g), (k), (p), (v), (w), and (y)), compliance (*see* PMA at Sections 2(a), (b), (g), (h), (i), (j), (k), (l), (n), (q), (r), (t), (z), (aa), (bb) and (cc)) and reporting (*see* PMA at Sections 2(b), (h), (i), (j), (n), (p), (r), (u), (y), (z), (aa) and (bb)) functions.

44

c.      that the PSF Subadvised Fund and the Fund had equivalent investment objectives (for the Fund, "to provide high total return from a portfolio of selected equity securities;" for the PSF Subadvised Fund, to "seek[] above-average total returns.");

d.      that the PSF Subadvised Fund and the Fund had exactly identical principal investment strategies, including:

> i)      a shared asset class focus on equities;
>
> ii)     a shared geographic focus on the U.S., with a shared restriction that at least 80% of each funds' portfolio consist of U.S. securities;
>
> iii)    a shared market capitalization focus on large capitalization stocks;
>
> iv)     a shared investment style that was largely agnostic to, and in effect blended, "growth" and "value" styles; and
>
> v)      a shared investment process (the one set forth in ¶ 64, *supra*); and
>
> vi)     a shared ability strategy to make short as well as long investments, within the following shared parameters:
>
> > a.  that net long exposure would be maintained at approximately 100% of net assets;
> >
> > b.  that long investments could vary from 90% to 150% of net assets; and
> >
> > c.  that short investments could vary from 0% to 50% of net assets.

In fact, and as detailed immediately below in ¶ 97(f), JPMIM did not merely utilize identical principal investment strategies for the Fund and for the PSF Subadvised Fund, but provided both with effectively identical portfolios filled with effectively identical investments.

45

e.      that the PSF Subadvised Fund was managed by the same three JPMIM portfolio managers that managed the Fund (Thomas Luddy, Susan Bao and Scott Davis);

f.      that, and unsurprisingly given the above-detailed similarities in the management, objectives and strategies of the funds, JPMIM provided the Fund and the PSF Subadvised Fund with substantially similar and in many respects identical investment portfolios, evident at both at the macro level of overall portfolio sector allocations and the micro level of individual stock selections.

i)      For example, the portfolios of the Fund and the PSF Subadvised Fund featured sector allocations (as of June 30, 2016; with amounts totaling to 130%) prioritized in the same order and with nearly the same weights:

| Sector | Percentage of Portfolio (Fund / PSF Subadvised Fund) |
|---|---|
| Information Technology | 20.3% / 26.5% |
| Financials | 17.2% / 22.0% |
| Consumer Discretion | 15.9% / 19.9% |
| Health Care | 14.4% / 18.3% |
| Industrial | 9.7% / 12.4% |
| Energy | 8.2% / 9.9% |
| Consumer Staples | 6.5% / 9.0% |

ii)     Likewise, at a more micro level, JPMIM provided the Fund and the PSF Subadvised Fund with largely similar and often identical investment selections – both long and short – as evidenced by the below data (extracted from the funds' "top ten" holding disclosures for long and short positions) showing that nine of the Fund's top ten long holdings, and eight of the Fund's top ten short holdings,

also numbered among the top ten long and short holdings of the PSF Subadvised Fund, most often with near-identical portfolio weights:

| Long Equity Holdings (9 of top 10 shared) | Percentage of Portfolio (Fund / PSF Subadvised Fund) |
|---|---|
| Chubb Switzerland | 2.6% / 1.9% |
| Microsoft | 2.5% / 2.4% |
| Occidental | 2.3% / 1.9% |
| Well Fargo | 2.3% / 1.9% |
| Broadcom | 2.3% / 1.9% |
| Lowe's | 2.1% / 2.0% |
| General Motors | 2.0% / 1.9% |
| Pfizer | 2.0% / 1.9% |
| Honeywell | 1.9% / 1.9% |

| Short Equity Holdings (8 of top 10 shared) | Percentage of Portfolio (Fund / PSF Subadvised Fund) |
|---|---|
| Clorox | 2.9% / 2.6% |
| Lockheed | 2.8% / 2.3% |
| Enbridge | 2.7% / 2.1% |
| Ventas | 2.6% / 2.5% |
| Boeing | 2.5% / 2.2% |
| Omnigroup | 1.9% / 1.5% |
| Duke | 1.8% / 1.5% |
| Baxter | 1.9% / 1.6% |

iii)   Similarly, the funds' ratios of individual long positions to individual short positions were largely similar.  For example, at June 30, 2016 the Fund's number of different long positions represented 56% of Fund's total number of different positions

(long and short), while the PSF Subadvised Fund's ratio at the same time was 55%.

g.      that, with the same managers employing the same strategies and selecting largely the same stocks, the Fund and the PSF Subadvised Fund performed similarly.   For example, for the year ending June 30, 2016, the Fund had a 2.65% loss and the PSF Subadvised Fund a 1.86% loss.

98.     The foregoing allegations indicate that the PSF Subadvised Fund is, in effect, an all-but identical "clone" of the Fund.

99.     Notwithstanding the substantial similarities in the services that JPMIM provided to the Fund and the PSF Subadvised Fund, the investment advisory fees that JPMIM charges to the two funds are substantially differ.   The fee rate JPMIM charges to the Fund, 0.80%, is 33.3% greater than the fee rate JPMIM receives for the PSF Subadvised Fund, 0.60%.

100.     Nomenclature alone – JPMIM serves as adviser to the Fund, and as subadviser of the PSF Subadvised Fund – does not justify the Fund's 33.3% advisory fee rate mark-up.   Yet the services provided by JPMIM to the two Funds, as demonstrated above, differ solely in nomenclature:  substantively, they are effectively identical.

101.     What accounts for the differing fees, rather, is the nature and status of JPMIM's clients.   The Fund is captive to JPMIM.   PLFA, which, as the PSF Subadvised Fund's investment adviser, retained JPMIM as subadviser, is not captive to JPMIM:  instead, it has an arm's-length relationship with JPMIM.

102.     The difference such lack of captivity makes is evident in and measured by the 25% discount to the Fund's advisory fee rates that PLFA was able to secure through negotiating fees with JPMIM at arm's-length.

103.    Indeed and additionally, a further and notable difference arising from the same source – namely, PLFA's status as an arm's-length, rather than captive, negotiator – is enshrined in the PMA itself, which contains a clause requiring JPMIM to notify PLFA in the event that JPMIM "acts as sub-adviser to another U.S. registered mutual fund that follows the same investment strategy as the [PSF Subadvised Fund]" but charges "less than the rate charged" to PLFA. *See* Ex. B at Clause 2(x) at p. 9.  This clause is, *sotto voce*, a "most favored nation" clause, arming PLFA to demand that the fee rates it pays to JPMIM not exceed those paid by any other JPMIM clients for similar services. No such clause exists in the IAA.

### 2.    Comparable Funds Paid Lower Advisory Fees for Similar Investment Advisory Services

104.    Comparison of the Fund's advisory fees with the advisory fees paid by comparable mutual funds pursuing comparable investment strategies further indicates that the advisory fees that JPMIM extracts from the Fund are excessive.  As set forth below, the advisory fee rates paid by the Fund are:

a.    sharply higher than those paid, on average, by mutual funds of comparable size, character and investment strategy;

b.    outliers, by virtue of advisory fee rates that are not merely above average, but that stand at the very highest end of the range of advisory fee rates paid by such comparable funds; and

c.    higher than the advisory fee rates paid by *any and all other mutual funds* pursuing similar investment strategies at similar size (*i.e.*, with net assets exceeding $1 billion dollars).

105.    To conduct such a comparison, Plaintiff's counsel analyzed data obtained from Bloomberg Terminal, distributed by Bloomberg Finance L.P. ("Bloomberg"), which, among

other things, maintains data on more than 7,000 U.S.-domiciled mutual funds, in order to find those funds most comparable to the Fund.  Bloomberg categorizes mutual funds, *inter alia*, by asset class, fund objective, fund strategy, fund geographic focus, and fund market-capitalization focus.

106.    Bloomberg categorizes the Fund as a U.S. equity large-cap blend fund.

107.    There are 291 "Large Cap Blend Mutual Funds" so-categorized by Bloomberg (including the Fund).  *See* Exhibit C1 (listing such funds).  The average investment advisory fee paid by those funds is **0.54%.**  *Id.*  The 0.80% fee rate currently extracted from the Fund's shareholders by JPMIM is 48.2% above such average.

108.    A yet more apt comparison, however, is to compare the Fund to its *closest* peers: namely, the subset of U.S. large-cap blend mutual funds who also share with the Fund *a large net asset size* (more than $1 billion).  Such large funds are more closely comparable because they present economies of scale in provision of investment advisory services that often allow for reduced advisory fee rates (as further detailed in Section VII.B, *infra*).  Of the aforementioned 291 U.S. large cap blend mutual funds, 92 have net assets exceeding $1 billion.  *See* Exhibit C2 (listing such funds).  The average investment advisory fee among these larger funds (excluding the Core Plus Fund) is **0.36%** -- *i.e.*, substantially lower than the 0.54% average discussed in the prior paragraph, which included advisory fees charged to smaller funds operating in the absence of economies of scale (and thus further confirming the distinctive nature of larger funds).  *Id.*

109.    The 0.80% advisory fee rate currently extracted from the Fund by JPMIM significantly exceeds this more apt 0.36% average (*i.e.*, the average fees paid by funds of similar character and size):  the Fund's advisory fee rate is **122% higher** than the average investment advisory fee paid by such larger U.S. large-cap blend funds.

110.    The Fund's fee rates are not merely significantly above average fee rates paid by its closest peers, but stand as marked outliers at the extreme end of the entire fee range.

111.    Indeed, among the 92 U.S. large-cap blend mutual funds with net assets over $1 billion, the Fund pays the *highest* advisory fees of all.  *See* Exhibit C2.

### 3.    The Board Performed Similar Comparisons Yielding Similar Factual Results (but Different Conclusions)

112.    As also and further detailed in Section VII.F.3.a *infra*, the Board, in the course of reviewing and approving the continuation of the IAAs and the advisory fee rates set forth therein, performed fee comparisons *similar to those set forth above, which yielded similar results*.  That the Board performed such comparisons is yet further indication that such comparisons are appropriate and apt.

113.    Specifically, the Board compared the Fund's advisory fee rates with:

a.    the advisory fee rates "offered to other clients of the Adviser" who received "investment management styles substantially similar to that of [the] Fund," including "funds sub-advised by the Adviser;" and

b.    the advisory fee rates "paid by other [mutual] funds in the same [] category as [the] Fund" – *i.e.*, funds with an identical "investment classification and objective" as determined by a mutual fund data provider (in this case, Broadridge/Lipper, which termed such similarly-classified mutual funds the "Universe").  *See* Fund  Semi-Annual Report on Form N-CSRS, filed with the SEC on or about March 3, 2017 (for the period ending December 31, 2016), at 43-44.

114.    Such comparisons provided the Board with factual information similar to that presented above, indicating that the advisory fee rates charged to the Fund were higher than those JPMIM "offered" to other JPMIM clients provided with "investment management styles

substantially similar to that of [the] Fund," and higher those paid by similar/peer mutual funds. *Id.* For example, the Board noted that "sub-advisory fees may be lower than those charged by the Adviser to [the] Fund." *Id.* at 43. Likewise, the Board noted that the Fund's *net* advisory fee – *i.e.*, *post*-Fee Waiver – was "in the first quintile of the Universe." (*i.e.*, the Fund's advisory fee rate placed the Fund among the 20% of similarly-classified funds with the highest advisory fee rates) *Id.* at 44.

115. However, as further discussed in Section VII.F.3.a, *infra*, the Board appears to have drawn *different* conclusions from these fundamentally similar factual inquiries and findings. As set forth in the Semi-Annual Report, immediately following the Board's observations that Fund fee rates were higher than those of (1) JPMIM's other clients who received "substantially similar" advisory services, and (2) similar mutual funds, the Board "concluded" that the Fund's advisory fee rates were "reasonable." *Id.* ("The Trustees concluded that the fee rates charged to [the] Fund in comparison to those charged to the Adviser's other clients were reasonable."; "[I]n light of this information [that Fund fees were in the first quintile of the Universe], the Trustees concluded that the advisory fee was reasonable.")

**B.     Economies of Scale**

116. In amending the ICA in 1970 to add Section 36(b), Congress, explicitly:  (a) recognized that significant economies of scale exist in the provision of investment advisory services to mutual funds; and (b) intended that the benefits of such economies of scale be shared with mutual fund shareholders, through use of breakpoints and/or other advisory fee rate reductions, rather than be monopolized by investment advisors. *See* Section VII.B.1, *infra*.

117. As the detailed factual allegations below indicate:

a.      the Fund's sizeable growth has generated substantial economies of scale for JPMIM in providing the Fund with investment advisory services;

b.    JPMIM has retained for itself the lion's share of such benefits, while releasing only a small trickle back to the Fund and/or the Fund's shareholders; and

c.    as a result, the current advisory fees that JPMIM charges to the Funds are grossly disproportionate to the investment advisory services provided, are excessive, and constitute a breach of JPMIM's fiduciary duties to the Fund.

### 1.    Background on Economies of Scale in Mutual Funds

118.    Economies of scale in the provision of advisory services arise from the fact that as assets under management ("AUM") increase, the marginal cost of providing advisory services for such AUM decreases.  Although the particular differential costs may vary, the principle holds generally and arises from multiple factors.

a.    For example, a simple example of economies of scale arises where AUM increases are due purely to market forces:  *i.e.*, an increase in the *value* of a fund's assets, even as such assets remain constant in amount and kind (1,000 shares of stock rising in value from $10,000 to $20,000).  In this event, the investment adviser services the additional AUM at *zero* additional variable cost – there is no change in the number or kind of securities held in the portfolio, or in the number of shareholders in the fund.  Although no additional investment advisory services need be or are rendered in this event, the investment adviser takes in twice its original advisory fees.

b.    Similarly, AUM can increase by virtue of existing fund holders purchasing more fund shares, which likewise produces no changes to the composition of the fund's portfolio or to the number of fund shareholders, and thus requires no additional provision of investment advisory services.

c.    Additionally, AUM can increase when *new* investors purchase fund shares, but even in this event the additional *investment advisory* costs are *de minimis* as: (1) the

additional dollars contributed by new shareholders are simply invested in the same core portfolio of securities already produced by prior investment advisory services; and (2) the additional *administrative* costs of adding new shareholders are borne by *other* parties (*e.g.*, transfer agents) pursuant to other contracts.

d.      Lastly and most basically, the work required to operate a mutual fund does not increase proportionately with the assets under management.  While initial and fixed operating costs for provision of investment advisory services are substantial (*e.g.*, salaries for research, trading and portfolio management personnel sufficient to manage an entire portfolio; offices to house them; procurement of systems and information necessary to conduct research and manage the portfolio), the variable costs for provision of further investment advisory services for further AUM are much smaller, and often negligible or nonexistent.

119.    For these reasons, and put simply, it does not cost an investment adviser one hundred times as much to render services to a $7 billion fund as a $70 million fund.  At some point – a point reached by the Fund, whose net assets rose from $69.2 million in 2006 to $9.8 billion in 2016 – the additional cost to provide advisory services to each additional dollar in the Fund (whether added by a rise in the value of the Fund's securities or additional contributions by current or new shareholders) approaches or equals zero.

120.    The existence of economies of scale in the mutual fund industry has been confirmed by the SEC and the Governmental Accounting Office (the "GAO"), both of whom conducted in-depth studies of mutual fund fees and concluded that economies of scale exist in the provision of investment advisory services.  *See* SEC Division of Investment Management, *Report on Mutual Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials, and*

*the Ranking Member, Committee on Commerce, House of Representatives* (2000) ("GAO Report"), at 9.  These findings have been further confirmed by academic research, which also describes the existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders.  *See e.g.* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610 (2001).

121.    Indeed, the legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is a principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

*See* Senate Report, at 4901-02.

122.    However, while mutual fund economies of scale are generated by (and therefore belong to) the mutual fund itself, mutual fund investment advisors can and often do monopolize the benefits of such economies of scale by continuing to charge high investment advisory fee rates on mutual fund assets even as a fund's asset base rises substantially.  As such fees become increasingly untethered to the costs of providing such services, they become excessive.

123.    To address the matter, share economy of scale benefits, and avoid taking excessive fees, investment advisors now frequently employ a declining rate structure in which the percentage of AUM taken as an investment advisory fee declines at higher AUM levels. This is done by providing a schedule of AUM "breakpoints" (*e.g*., $500 million, $1 billion, $5 billion, etc.) at which investment advisory fee rates on AUM above such breakpoints decrease. For example, per the above breakpoint schedule, one rate (the highest) could be applied as the fee for all assets up to $500 million (*e.g*., 0.80%); another, lower rate could be applied as the fee for

assets between $500 million and $1 billion (*e.g.*, 0.70%); a third rate, lower still, as the fee for

assets between $1 billion and $5 billion (*e.g.*, 0.60%); etc. (*e.g.*, a rate of 0.50% for assets

between $5 billion and $10 billion). Such breakpoint-adjusted fee schedules reflect (but do not

mirror) the cost efficiencies and economies of scale in the management of mutual fund portfolios

as mutual funds' AUM grow.

124.    Adoption of breakpoints can allow investment advisers to comply with the above-

stated Congressional intent that investment advisers "reduce their effective charges as the fund

grows in size."

### 2.    The Fund's Growth Generated Significant Economies of Scale that JPMIM Largely Monopolized

125.    Exhibit E hereto sets forth data relevant to economies of scale, extracted from

prospectuses and annual reports filed with the SEC by the Fund, concerning, respectively, the

operations of the Fund during each of the last ten completed fiscal years (*i.e.*, fiscal 2006 through

fiscal 2016).  Such data includes:

  a.    the Fund's net assets (as of the close of each fiscal year);

  b.    disaggregation of net asset value into

      i)    paid-in capital (*i.e.*, the amounts invested into the Fund by shareholders); and

      ii)    investment appreciation (or depreciation);

  c.    the Fund's number of shares outstanding;

  d.    the Fund's advisory fees paid;

  e.    the Fund's blended advisory fee rates;

  f.    the Fund's advisory fee rate schedules;

  g.    the Fund's reported portfolio turnover;

56

      h.     the Fund's number of equity holdings; and

      i.     the Fund's portfolio managers.

126.    Such data indicates, as set forth in detail below, that:

      a.    the Fund's sharp growth generated economies of scale for JPMIM in its provision of advisory services to the Fund, insofar as:

          i)    the Fund skyrocketed in size between 2006 and 2016, with the Fund growing more than ten-fold from $69.2 million to $9.86 billion; and

          ii)   while the *work required* of JPMIM to provide the Fund with advisory services did *not* grow at the same rate, but, instead, far more slowly (and in certain material respects did not grow at all);

      b.    the Fund's advisory fee rates allowed JPMIM to retain the lion's share of the benefits generated by such economies of scale, insofar as:

          i)    the advisory fees that the Fund paid to JPMIM effectively tracked the skyrocketing growth of the Fund's assets, rather than the *far-slower growth of the work required* of JPMIM to provide advisory services to the Fund; and

          ii)   the Fund's advisory fee rates *included no breakpoints whatsoever*, but instead charged the same flat rate on the first dollar and the last dollar (of approximately ten billion dollars) of Fund net assets.

**a.  The Fund's Growth Generated Significant Economies of Scale**

127.   The sharp growth in the Fund's size was not accompanied by parallel growth in the advisory services required of, or provided by JPMIM (or of JPMIM's costs to provide the Fund with advisory services), as indicated *inter alia* by the particularized facts set forth below.

128.    First, notwithstanding the Fund's sharp net asset growth, the Fund experienced far slower growth in the number of different equity investments it held.  See Ex. E at "Number of Equity Holdings" column.

129.    For example, in fiscal 2007, when the Fund's net assets first exceeded $1 billion ($1.42 billion), it held 212 different stocks in its portfolio.  However, nine years later in fiscal 2016, with Fund net assets having more-than-sextupled to approach $10 billion ($9.876 billion), the Fund held 319 investments.  *Id.*  In other words, while Fund net assets grew by over 600%, the number of investments that JPMIM managed in the Fund's portfolio grew by only 50%. Within that delta lies a financial windfall for JPMIM which saw its advisory fees – *linked to Fund net assets rather than to the work actually required of or performed by JPMIM* – rise nearly 30-fold, from $2.7 million in 2007 to $77.5 million in 2016.  *See* Ex. E at "Advisory Fees Paid" column.

130.    Second, the Fund' portfolio turnover has remained relatively consistent since the Fund's inception.  In 2007, the turnover rate was 138% (towards the high end of the Fund's spectrum over the last decade, which ranged from 102% to 110%).  *See* Ex. E at "Portfolio Turnover" column.  In 2016, the Fund's turnover rate was 127%, right in line with the Fund's average turnover rate during the period (125.4%).  *Id.*

131.    Consequently, to the extent that the advisory work performed can be measured by such concrete facts indicative of actual advisory activity – the number of different stocks held in the Fund's portfolios and the extent to which the Fund's portfolios are changed each year – the advisory services that the Fund requires of JPMIM have, at best, grown by 50% (and at worst, effectively stayed constant) throughout this period.

132.   Third, to the extent that advisory work is also measured by the time and effort expended to research and identify potential new investments, exactly the same holds true.

133.   During the same 2006-2016 period, the Fund's investment goal / investment objective, principal investment strategies and investment process have all remained exactly the same.  *See, e.g.*, Fund prospectuses from 2007 through 2016.  JPMIM:

      a.    considers the same universe of potential equity investments now, in 2016, that it did in 2007;

      b.    uses the same investment process to evaluate such securities; and

      c.    runs the same investment strategies with the same specific parameters, including:

          i)    at least 80% of the portfolio composed of U.S. large capitalization companies with characteristics tracking the S&P 500 and Russell 1000 indices;

          ii)    with sector concentrations based on the S&P 500, with moderate under- or over-weighting permissible based on JPMIM's views concerning sector prospects;

          iii)    maintaining approximate 100% long exposure, with long positions allowed to range from 90% to 150% of Fund net assets, and short positions from 0% to 50%.

134.   Consequently, notwithstanding the dramatic growth in the Fund's net assets and JPMIM's advisory fees, the work facing JPMIM has stayed fundamentally constant:  it faces the same universe of possible investment securities, to which it applies the same techniques and strategies, in pursuit of the same ends.

135.     Fourth, and relatedly, the number and identity of the portfolio managers JPMIM uses to service the Fund has stayed consistent.  The Fund has featured exactly the same two portfolio managers throughout the 2006-2015 period (Thomas Luddy and Susan Bao), even as Fund assets jumped from $69 million in 2006 to $11.8 billion in 2015.  In 2016, a third manager, Scott Davis was added.  *See* Ex. E at "Portfolio Managers" column.

136.     Fifth, although the number of shares issued by the Fund has also increased sharply (albeit with a similar number of shares today as there were 2011), such increases in the number of shares (and or shareholders) *do not impose any additional advisory work (or costs) on JPMIM*.  Instead, the extra work and costs associated with the increases in Fund shares and Fund shareholders are matters born by:

a.     the Fund's Transfer Agent, BFDS, which handles shareholder accounts and shareholders in the first instance, and which is compensated directly by the Fund for such additional (non-advisory work) by flat fees charged for each new account; and

b.     the Fund's Shareholder Servicing Agent, JPMDS, which is tasked with responding to almost all shareholder inquiries concerning the Fund.

137.     Sixth, as Exhibit E further demonstrates, at any given time a substantial amount of the Fund's net asset value consists of *mere market appreciation*.  *See* Ex. E at "Share of Fund Assets Consisting of Appreciation" column; *see also* prior three columns ("Fund Net Assets," "Paid-in Capital," and "Unrealized and Undistributed Income and Gains").  For example, in 2016, 24.78% of the Fund's net asset value consisted of market appreciation – and, since the Fund's inception, an average of 11.1% of net asset value stems from market appreciation.  *Id.* Such contributions to net asset value require little, if any, additional investment advisory services.

138.   The foregoing particularized facts set forth above all indicate the same thing in different ways: that the advisory services required of and/or provided by JPMIM have not grown appreciably (if at all), even as the Fund's size has increased six-fold.

### b.   JPMIM Monopolized the Economy of Scale Benefits that the Fund's Size Provided

139.   Notwithstanding and in contrast to the above facts, the advisory fees that the Fund paid to JPMIM tracked the skyrocketing growth of the Fund's net assets, rather than the far-slower growth of the work required of JPMIM to provide the Fund with requisite advisory services.

140.   For example, as Fund net assets increased more than six-fold from 2007 ($1.4 billion) to 2016 ($9.9 billion), the Fund's annual advisory fees payable increased approximately 20-fold (from $4.5 million to $90.2 million), and the Fund's annual advisory fees actually paid, post-Fee Waiver, increased nearly 30-fold (from $2.7 million to $77.6 million).  *See* Exhibit E.

141.   In other words, as the Fund grew (and generated the economies of scale demonstrated above), JPMIM's advisory fees became unmoored from – and ceased to bear any reasonable relationship to – the advisory services that JPMIM provided.   Such fees were therefore excessive.

142.   The above-mentioned, eye-popping advisory fee increases were not the result of JPMIM providing the Fund with 20- to 30-times more advisory services in 2016 as in 2007, or of JPMIM's costs to provide the Fund with advisory services rising 20- to 30-fold during such period.  To the contrary, and as detailed immediately above, neither the amount nor the cost of JPMIM's advisory services to the Fund grew anywhere close to the rate of the Fund's net assets (and advisory fees) – but rather, by all indications, grew far more modestly (*e.g.*, by 50%), if at all.  The increase in advisory fees during this period was not a function of any similar increase in

advisory services provided, or in the cost to JPMIM to provide such services, but instead was merely an artifact of JPMIM's fee rates as set forth in the IAA.

143.    That the growth in advisory fees far outstripped any growth in services provided (or the cost to provide such services) indicated both that the Fund's net asset growth generated significant economies of scale for JPMIM, and that JPMIM monopolized, rather than shared, the benefits flowing from such economies.

> **c.    The IAA Provided no Breakpoints to Share Any Portion of the Economy of Scale Benefits Generated by the Fund's Size with the Fund's Shareholders**

144.    JPMIM's advisory fees were able to keep direct pace with the sharp increase in Fund net assets, rather than with the modest increase in JPMIM's work or costs, because JPMIM's advisory fee rates were not merely based on the Fund's net assets (at an annualized rate of 0.80% of Fund net assets), *but because the IAA provided no breakpoints to such fee rate –* and, instead, allowed JPMIM assess the same 0.80% fee rate on the Fund's last (ten-billionth) dollar as the Fund's first dollar.  Unconstrained by any fee rate breakpoints, JPMIM's advisory fees were able to break free of any and all links to the actual advisory services that JPMIM provided, and instead follow the Fund's assets skywards.

145.    This absence of any and all breakpoints allowed JPMIM to keep for itself the *entirety* of the economy of scale benefits generated by the Fund's net asset growth.

**C.    The Nature and Quality of the Investment Advisory Services JPMIM Provided to the Fund**

> **1.    The *Nature* of the Services JPMIM Provided as *Investment Adviser* to the Fund**

146.    As detailed in Section VI.A, *supra*, the services provided by JPMIM pursuant to the IAA and as investment adviser to the Fund are, primarily, Portfolio Selection Services, and,

in comparatively *de minimis* part, Other Services (a modicum of administrative, compliance and reporting services not already provided by the Fund's other service providers).

147.    All further services and expenses necessary to operate the Fund were provided by other parties pursuant to separate contracts with the Fund, or were separately paid for the by the Fund.  *See* Section V.B.2, *supra*.

148.    Notably, the services specifically at issue here are even more circumscribed to Portfolio Selection Services than usual because of JPMIM's separate role and extensive responsibilities as the Fund's Administrator, for which JPMIM was separately compensated.  *See* Section V.B.2.c, *supra*.  Substantially all administrative work that JPMIM performed for the Fund was work that JPMIM performed *as Administrator*, pursuant to the Administration Agreement and in exchange for separate administration fees.

### 2.    The *Quality* of the Such Services

149.    As the Fund's SEC filings make clear, JPMIM's Portfolio Selection Services specifically are the primary metric by which JPMIM, the Fund's shareholders and the Fund's Board judge the quality of JPMIM's services.

150.    For example, the "Fund Commentary" sections of the Fund's annual and semi-annual reports filed with the SEC focused, invariably and exclusively, on JPMIM's Portfolio Selection Services.

151.    Likewise, the same Fund SEC filings featured extensive disclosures relating solely to JPMIM's Portfolio Selection Services, including the Fund's top ten long and short positions, analyses of the Fund's sector allocations (long and short), each of the positions in the Fund's portfolio, and the Fund's overall performance over various time periods.

152. More tellingly, the Board, tasked with evaluating the quality of JPMIM's services, focused its concrete evaluation on the Fund's investment performance (in which JPMIM's Portfolio Selection Services are encapsulated).  For example, and as set forth in the Fund's Semi-Annual Report:

> Investment Performance
>
> The Trustees received and considered absolute and/or relative performance for the Funds in a report prepared by Broadridge/Lipper. The Trustees considered the total return performance information, which included the ranking of the Funds within a performance universe made up of funds with the same Broadridge/Lipper investment classification and objective (the "Universe"), as well as a sub-set of funds within the Universe (the "Peer Group"), by total return for applicable one-, three- and five-year periods. The Trustees reviewed a description of Broadridge/Lipper's methodology for selecting mutual funds in each Fund's Peer Group and Universe. The Broadridge/Lipper materials provided to the Trustees highlighted information with respect to certain representative classes to assist the Trustees in their review.
>
> As part of this review, the Trustees also reviewed each Fund's performance against its benchmark and considered the performance information provided for the Funds at regular Board meetings by the Adviser and the Trustees' independent consultant and also considered the special analysis prepared by the Trustees' independent consultant. The Broadridge/Lipper performance data noted by the Trustees as part of their review and the determinations made by the Trustees with respect to each Fund's performance for certain representative classes are summarized below.
>
> ***
>
> The Trustees noted that the U.S. Large Cap Core Plus Fund's performance for Class A shares was in the third, third, and fourth quintiles, based upon the Universe, for the one-, three-, and five-year periods ended December 31, 2015, respectively. The Trustees noted that the performance for Select Class shares was in the third, second, and third quintiles, based upon the Universe, for the one-, three-, and five-year periods ended December 31, 2015, respectively. The Trustees discussed the performance and investment strategy of the Fund with the Adviser and reviewed the performance analysis prepared by the independent consultant.

> Based upon these discussions, and various other factors, the Trustees concluded that the Fund's performance was reasonable.

*See* Semi-Annual Report, at 44.

153.    This very information reviewed by the Board indicates a disconnect between the quality of the services provided and the level of the fees charged.  The Fund's performance, versus similar mutual funds, was essentially middling (with Class A share performance in the third, third and fourth quintiles for 1-, 3- and 5-year periods; and with Select Class shares showing slightly better relative performance at third, second and third quintiles for the same periods).  The Fund's fees, however were at the highest end of the range.

154.    Consequently, the quality of the Portfolio Selection Services provided by JPMIM to the Fund does not rise to the same high level as the advisory fees charged by JPMIM to the Fund.  That the Fund paid fees substantially higher than average – and, indeed, higher than every single other comparable fund of comparable size – for performance that was just average is further indication that the Fund's investment advisory fees are excessive.

## D.    The Profitability of the Fund to the Adviser

155.    JPMIM, as a wholly-owned subsidiary of JPMC, does not disclose its financial results, and consequently, JPMIM's profitability – both generally, and specifically with respect to providing the Fund with advisory services – are known solely to Defendant and its affiliates.

156.    However, particularized facts indicate that JPMIM's profitability from advising the Fund is so unusually high as to be excessive.

157.    First, as set forth in Section VII.A.1.a, *supra*, comparison with the JPM Equity Fund reveals that although JPMIM: (1) incurs *less* costs in advising the Fund than in advising the JPM Equity Fund; (2) JPMIM charges the Fund an advisory fee rate *twice as high* as that charged to the JPM Equity Fund (0.80% versus 0.40%).  Assuming that the JPMIM's operations

with respect to the JPM Equity Fund provide JPMIM with a reasonable profit, JPMIM's operations with respect to the Fund – which presents a lower cost structure coupled with a doubled fee rate – yield an *unreasonable* profit. Such profit is unreasonable because JPMIM's advisory fee rates have effectively decoupled from JPMIM's advisory costs, and cease to bear any reasonable relation (of the sort in the JPM Equity Fund) to such costs.

158.    Second, as set forth in Section VII.B.2, *supra*, the Fund's sharp asset growth has generated tremendous economies of scale for JPMIM in providing the Fund with requisite investment advisory services.  Because (1) JPMIM's advisory fees are directly tied to and follow Fund assets and Fund asset growth, and (2) because, for the reasons set forth in Section VII.B.2, *supra*, such asset growth has been far sharper than the growth in the services that JPMIM provided or the cost of providing such services, (3) JPMIM's fees have decoupled from JPMIM's services and the cost of such services.  And, as set forth in Sections VII.B.2.b-c *supra*, the absence of any fee breakpoints in the IAA (which allows JPMIM to charge the same 0.80% advisory fee rate against the Fund's first dollar and the Fund's ten billionth dollar), means that JPMIM has entirely monopolized the benefits from the economies of scale generated by the Fund's size, and has shared none of them with the Fund or Fund shareholders.  These sizeable economy of scale benefits, and their retention in entirety by JPMIM, allow JPMIM to extract unreasonable and excessive profits.

159.    Third, as set forth in Section VII.A.2, *supra* and in Exhibit C2, the Fund's advisory fee rates are higher than those paid by *every* other mutual fund that pursues a similar investment strategy and that enjoys a similarly large size (at least $1 billion of new assets).  This is further indication that JPMIM's profits from the Fund are unusually high and excessive, insofar as: (1) the Fund's fee rates, which generate JPMIM's revenues with respect to the Fund,

66

are higher than those of *all* other comparable large mutual funds; and (2) the economies of scale that JPMIM enjoys in providing advisory services to the Fund, due to the Fund's large size, function to reduce JPMIM's per-unit costs to provide advisory services.

160.    Fourth, as shown in Exhibit D hereto, the Fund's advisory fee rate (0.80%) is the highest of all equity-focused mutual funds in JPMC Fund Family that have at least $3 billion of assets.  Indeed, the average advisory fee rate among such large JPMC Fund Family funds is 0.53%.  The Fund's large size and outsize fees thus further indicate that it is among the three most profitable equity-focused funds in the entire JPMC Fund Family.

###    E.    Fall-Out Financial Benefits Attributable to the Fund

161.    The Fund's captive relationship with JPMIM gives rise to two "fall-out" benefits that (a) accrue to JPMIM and its affiliates, and (b) would not exist or accrue but for JPMIM's relationship with the Fund.

162.    First, and as the direct result of JPMIM serving as the Fund's investment adviser, JPMIM and its affiliates were engaged to provide numerous other services to the Fund, pursuant to separate service contracts, and received substantial fees for providing such other services. Specifically:

a.    JPMIM was also appointed as the Fund's Administrator, and received additional compensation, pursuant to its Administration Agreement, for providing the Fund with administrative services;

b.    JPMDS was also appointed as the Fund's Shareholder Servicing Agent, and received additional compensation, pursuant to its Shareholder Servicing Agreement, for providing the Fund with Shareholder Servicing services; and

c.       Chase was also appointed as the Fund's Custodian and Accountant, and received additional compensation, pursuant to its Custody/Accounting Agreement, for providing the Fund with custodial and accounting services.

163.    For the most recent six month period for which Fund financial statements exist (the period ending December 31, 2016), JPMIM and its affiliates received – as fall-out benefits – the following amounts of fees:

a.       $4.067 million of fees payable to JPMIM as Administrator (of which $3.029 million were waived pursuant to the Fee Waiver, for a net payment of $1.038 million);

b.       $11.847 million of fees payable to JPMDS as Shareholder Servicing Agent (or which $1.502 million were waived pursuant to the Fee Waiver, for a net payment of $10.345 million); and

c.       $165,000 of fees payable to Chase as Custodian and Account.

164.    As set forth above, such fall-about benefits total to $11.5 million dollars over a six-month period, and thus, annualized, amount to approximately $23 million per year.

165.    Second, as detailed in Section VII.A.1.b, *supra*, JPMIM: (1) provides PLFA with an effective "clone" of the Fund – the PSF Subadvised Fund; and (2) receives an annualized fee of 0.60% of the PSF Subadvised Fund's net assets for doing so.

166.    Providing PLFA with a copy of the Fund costs JPMIM almost nothing.  The Fund already exists fully formed, and its development was already paid for by Fund shareholders through the Fund advisory fees paid to JPMIM to allow JPMIM to develop and manage the Fund.  In other words, copying the Fund requires JPMIM to provide little or no new Portfolio Selection Services that it has not already developed and/or provided.  And although the Other Services required of JPMIM by PLFA are quite substantial (as noted above at Section VII.A.1.b,

*supra* and in Exhibit B), their costs are still relatively minimal – and dwarfed by the subadvisory fees JPMIM receives from PLFA for subadvising the PSF Subadvised Fund.  Consequently, the additional advisory fee stream that JPMIM enjoys from cloning the Fund is enjoyed all the more because JPMIM experiences it almost entirely as pure profit.

167.    The advisory fee revenues and profits accruing to JPMIM from having spun off a Fund clone constitute a fall-out benefit because, absent its relationship with the Fund, JPMIM would not be able to provide such a clone at all, let alone do so while incurring almost no costs.

168.    The annual value of this second fall-out benefit to JPMIM, based on the PSF Subadvised Fund's most-recently disclosed net asset value of $798.7 million (as of December 31, 2016) and JPMIM's subadvisory fee rate of 0.60%, is $4.792 million.

169.    The combined annual value of these fall-out benefits, approximately $28 million, is not only substantial, but also more than offsets the annualized amount of Fund-related fees that JPMIM and its affiliates "waived" pursuant to the Fee Waiver (approximately $18 million per year – *see* Section VI.B.2, *supra*).

### F.    The Care and Conscientiousness of the Fund's Board in Approving Continuation of the IAA and the Fund's Advisory Fees

170.    Mutual fund investment advisory fees are "set" (reviewed, evaluated and approved) by mutual funds' boards of trustees on an annual basis.

171.    The ICA requires, in connection with such annual fee evaluation and approval process, that:

> a.    the board request, obtain and evaluate "such information as may reasonably be necessary" for evaluation of the advisory fees; and
>
> b.    that the investment adviser provide the board with such information:
>
> It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment

> adviser to such company to furnish, such information as may
> reasonably be necessary to evaluate the terms of any contract
> whereby a person undertakes regularly to serve or act as
> investment adviser of such company.

*See* 15 U.S.C. § 80a-15(c).

172.    Where a board's fee evaluation and approval *procedure* is deficient, a board's fee approval may lack adequate basis, and hence merits little judicial deference.

173.    Such procedural deficiencies arise primarily in two ways:

a.    **Deficiencies in the Information Considered**.    For example, an investment adviser may fail to provide the board with relevant, accurate and/or complete information, or, similarly, the board may fail to request, obtain and/or evaluate relevant, accurate and complete information necessary for reasonable evaluation of advisory fees.    In such instances, a board's fee approval is based on partial, inaccurate and/or misleading information, and hence:  (a) merits little deference, and (b) itself constitutes *further* indication of excessive fees.

b.    **Deficiencies in the Manner of Consideration**.    A board may fail to exhibit adequate conscientiousness in considering and evaluating the information it receives (including the degree to which such information is accurate, sufficient and/or complete).    In such instances, a board's fee approval likewise may lack adequate basis, and may hence merit little deference and itself constitute further indication of excessive fees.

174.    Additionally, a fee can be excessive *in substance* – wholly apart from whether the procedure used in setting it was sufficient or defective, and even where such procedure was in all appearances adequate.

70

175. Here, the procedure through which the Fund's Board "set" such fees was deficient, and additionally, irrespective of procedure, the Fund's investment advisory fees were excessive in substance.

### 1. The Fund's Board

176. The JPMC Trust's Board of Trustees (the "Board") is comprised of the following twelve persons, each of whom serves as a Trustee not only for the Fund, and not only for all the other captive funds housed in the JPMC Trust, but for a total of 153 captive funds in the JPMC Fund Family, housed in the JPMC Trust and 11 similar vehicles:

| Trustee | Birth Year | Trustee Since | Board Leadership Positions |
|---|---|---|---|
| John F. Finn | 1947 | 2005 | Chair, Equity Committee |
| Dr. Matthew Goldstein | 1941 | 2005 | Chairman of Board; Chair, Governance Committee |
| Dennis P. Harrington | 1945 | 2017 | |
| Frankie D. Hughes | 1952 | 2008 | |
| Peter C. Marshall | 1942 | 2005 | |
| Mary E. Martinez | 1960 | 2013 | co-chair, Money Market and Alternative Products Committee |
| Marilyn McCoy | 1948 | 2005 | Chair, Compliance Committee |
| Mitchell M. Merin | 1953 | 2013 | Chair, Fixed Income Committee |
| Dr. Robert A. Oden, Jr. | 1946 | 2005 | |
| Marian U. Pardo | 1946 | 2013 | co-chair, Money Market and Alternative Products Committee |
| Frederick W. Ruebeck | 1939 | 2005 | |
| James J. Schonbachler | 1943 | 2005 | Chair, Audit and Valuation Committee |

177. Each Trustee receives annual base compensation of $340,000 for his or her services. The Board's Chairman, Dr. Goldstein, receives an additional $225,000 annually (as well as expense reimbursements of $4,000 per month). Committee chairs (other than the Chairman) receive an additional $50,000 annually (co-chairs receive $25,000 each). The above-

summarized compensation is paid directly by the 153 funds in the JPMC Fund Family overseen

by the Board, on a pro-rata basis.

178.    Once nominated and elected to the Board, Trustees never stand for re-election, but

instead enjoy "indefinite" terms until reaching retirement age (78), resigning, dying, or being

removed or disqualified.  Seven of the twelve Trustees have served in such capacity for more

than 10 years.  Each of the Trustees qualifies under the ICA as a "non-interested" or independent

trustee.

179.    The Board includes multiple committees thereof, including three committees that

divide the 153 fund overseen by the Board into three subsets – equity funds, fixed income funds,

and money market and alternative products funds – overseen, respectively, by the Equity

Committee, Fixed Income Committee and Money Market and Alternative Products Committee:

> ***Equity Committee, Fixed Income Committee and Money Market
> and Alternative Products Committee.*** …These three Committees
> are divided by asset type and different members of the Board serve
> on each committee with respect to each asset type. The function of
> the Committees is to assist the Board in the oversight of the
> investment management services provided by the Adviser to the
> Funds, as well as any sub-adviser to the Funds. The primary
> purpose of each Committee is to (i) assist the Board in its oversight
> of the investment management services provided by the Adviser to
> the Funds designated for review by each Committee; and (ii)
> review and make recommendations to the Board concerning the
> approval of proposed new or continued advisory and distribution
> arrangements for the Funds or for new funds.

*See* the Fund's Statement of Additional Information ("SAI") dated February 28, 2017, Part II at

83.

180.    Consequently, the Board's Equity Committee – comprised of Mr. Finn (chair),

Mr. Harrington and Ms. McCoy – assists the Board in its oversight of, specifically, the Fund, and

is tasked with reviewing, and making recommendations to the Board concerning, continuation of the Fund's IAA and the advisory fee rates set forth therein.

### 2.    The Board Approved Substantively Excessive Advisory Fees

181.    Matters of process or procedure aside, the investment advisory fees approved by the Board were excessive, in substance and result, for the reasons set forth in Sections VII.A-E, *supra.*

182.    Furthermore, the Board's approval of substantively excessive fees stemmed in part from a deficient process for the consideration, evaluation and approval of the Fund's advisory fees, as detailed immediately below in Section VII.F.3.

### 3.    The Board's Deficient Approval Process

183.    The precise manner in which the Board evaluated and approved the Fund's IAA and the investment advisory fee rates set forth therein – including the information JPMIM furnished to the Board; the information that the Board considered and evaluated; and the Board's conscientiousness in reviewing proffered, relevant and/or requisite information – is a matter within the particular knowledge and exclusive control of Defendant and the Board.

184.    The only *publicly-available* information concerning the Board's evaluation and approval is the purported summary of such evaluation and approval, authored by Defendant, provided each year in the Fund's semi-annual report on Form N-CSRS filed with the SEC (hereinafter, the "Fee Approval Summary").

185.    The most recent Fee Approval Summary, contained in the Fund's Semi-Annual Report on Form N-CSRS filed with the SEC on or about March 3, 2017, and concerning the Board's June 2016 and August 2016 meetings during which the Board evaluated and decided to approve continuation of the IAAs through October 2017, is reproduced below:

## BOARD APPROVAL OF INVESTMENT ADVISORY AGREEMENT

The Board of Trustees has established various standing committees composed of Trustees with diverse backgrounds, to which the Board of Trustees has assigned specific subject matter responsibilities to further enhance the effectiveness of the Board's oversight and decision making. The Board of Trustees and its investment committees (money market and alternative products, equity, and fixed income) meet regularly throughout the year and consider factors that are relevant to their annual consideration of investment advisory agreements at each meeting. They also meet for the specific purpose of considering investment advisory agreement annual renewals. The Board of Trustees held meetings in person in June and August 2016, at which the Trustees considered the continuation of the investment advisory agreements for each of the Funds whose semi-annual report is contained herein (each an "Advisory Agreement" and collectively, the "Advisory Agreements"). At the June meeting, the Board's investment committees met to review and consider performance, expense and related information for the J.P. Morgan Funds. Each investment committee reported to the full Board, which then considered the investment committee's preliminary findings. At the August meeting, the Trustees continued their review and consideration. The Trustees, including a majority of the Trustees who are not "interested persons" (as defined in the 1940 Act) of any party to the Advisory Agreements or any of their affiliates, approved the continuation of each Advisory Agreement on August 17, 2016.

As part of their review of the Advisory Agreements, the Trustees considered and reviewed performance and other information received about the Funds from the Adviser. This information includes the Funds' performance as compared to the performance of their peers and benchmarks and analyses by the Adviser of the Funds' performance. In addition, the Trustees have engaged an independent management consulting firm ("independent consultant") to report on the performance of certain J.P. Morgan Funds at each of the Trustees' regular meetings. The Adviser also periodically provides comparative information regarding the Funds' expense ratios and those of their peer groups. In addition, in preparation for the June and August meetings, the Trustees requested, received and evaluated extensive materials from the Adviser, including performance and expense information compiled by Broadridge, using data from Lipper Inc., independent providers of investment company data (together, "Broadridge/Lipper"). The Trustees' independent consultant also provided additional analyses of the performance of the Funds in connection with the Trustees'

review of the Advisory Agreements. Before voting on the proposed Advisory Agreements, the Trustees reviewed the proposed Advisory Agreements with representatives of the Adviser, counsel to the Trust and independent legal counsel and received a memorandum from independent legal counsel to the Trustees discussing the legal standards for their consideration of the proposed Advisory Agreements. The Trustees also discussed the proposed Advisory Agreements in executive sessions with independent legal counsel at which no representatives of the Adviser were present. Set forth below is a summary of the material factors evaluated by the Trustees in determining whether to approve each Advisory Agreement.

The Trustees considered information provided with respect to the Funds over the course of the year. Each Trustee attributed different weights to the various factors and no factor alone was considered determinative. From year to year, the Trustees consider and place emphasis on relevant information in light of changing circumstances in market and economic conditions. The Trustees determined that the compensation to be received by the Adviser from each Fund under the applicable Advisory Agreement was fair and reasonable and that the continuance of the Advisory Agreements was in the best interests of each Fund and its shareholders.

The factors summarized below were considered and discussed by the Trustees in reaching their conclusions:

*Nature, Extent and Quality of Services Provided by the Adviser*

The Trustees received and considered information regarding the nature, extent and quality of the services provided to each Fund under the Advisory Agreement. The Trustees took into account information furnished throughout the year at Trustee meetings, as well as the materials furnished specifically in connection with this annual review process. The Trustees considered the background and experience of the Adviser's senior management and the expertise of, and the amount of attention given to each Fund by, investment personnel of the Adviser. In addition, the Trustees reviewed the qualifications, backgrounds and responsibilities of the portfolio management team primarily responsible for the day-to-day management of each Fund and the infrastructure supporting the team. The Trustees also considered information provided by the Adviser and JPMorgan Distribution Services, Inc. ("JPMDS") about the structure and distribution strategy of each Fund. The Trustees reviewed information relating to the Adviser's risk governance model and reports showing the Adviser's compliance

structure and ongoing compliance processes. The Trustees also considered the quality of the administrative services provided by J.P. Morgan Investment Management Inc. in its role as administrator ("JPMIM").

The Trustees also considered their knowledge of the nature and quality of the services provided by the Adviser and its affiliates to the Funds gained from their experience as Trustees of the J.P. Morgan Funds. In addition, they considered the overall reputation and capabilities of the Adviser and its affiliates, the commitment of the Adviser to provide high quality service to the Funds, their overall confidence in the Adviser's integrity and the Adviser's responsiveness to questions or concerns raised by them, including the Adviser's willingness to consider and implement organizational and operational changes designed to improve investment results and the services provided to each Fund.

Based upon these considerations and other factors, the Trustees concluded that they were satisfied with the nature, extent and quality of the investment advisory services provided to the Funds by the Adviser.

*Costs of Services Provided and Profitability to the Adviser and its Affiliates*

The Trustees received and considered information regarding the profitability to the Adviser and its affiliates in providing services to each of the Funds. The Trustees reviewed and discussed this data. The Trustees recognized that this data is not audited and represents the Adviser's determination of its and its affiliates' revenues from the contractual services provided to the Funds, less expenses of providing such services. Expenses include direct and indirect costs and are calculated using an allocation methodology developed by the Adviser. The Trustees also recognized that it is difficult to make comparisons of profitability from fund investment advisory contracts because comparative information is not generally publicly available and is affected by numerous factors, including the structure of the particular adviser, the types of funds it manages, its business mix, numerous assumptions regarding allocations and the fact that publicly-traded fund managers' operating profits and net income are net of distribution and marketing expenses. Based upon their review, the Trustees concluded that the profitability to the Adviser under each of the Advisory Agreements was not unreasonable in light of the services and benefits provided to each Fund.

*Fall-Out Benefits*

The Trustees reviewed information regarding potential "fallout" or ancillary benefits received by the Adviser and its affiliates as a result of their relationship with the Funds. The Trustees also reviewed the Adviser's allocation of fund brokerage for the J.P. Morgan Funds complex, including allocations to brokers who provide research to the Adviser.

The Trustees also considered that JPMDS, an affiliate of the Adviser, and JPMIM earn fees from the Funds for providing shareholder and administrative services, respectively. These fees were shown separately in the profitability analysis presented to the Trustees. The Trustees also considered the payments of Rule 12b-1 fees to JPMDS, which also acts as the Funds' distributor and that these fees are in turn generally paid to financial intermediaries that sell the Funds, including financial intermediaries that are affiliates of the Adviser. The Trustees also considered the fees paid to JPMorgan Chase Bank, N.A. ("JPMCB") for custody and fund accounting and other related services.

*Economies of Scale*

The Trustees considered the extent to which the Funds may benefit from economies of scale. The Trustees considered that there may not be a direct relationship between economies of scale realized by the Funds and those realized by the Adviser as assets increase. The Trustees noted that the proposed investment advisory fee schedule for each Fund does not contain breakpoints, but that the fees remain competitive with peer funds. The Trustees also considered that the Adviser has implemented fee waivers and expense limitations ("Fee Caps") which allow each Fund's shareholders to share potential economies of scale from a Fund's inception. The Trustees also considered that the Adviser has shared economies of scale by adding or enhancing services to the Funds over time, noting the Adviser's substantial investments in its business in support of the Funds, including investments in trading systems and technology (including cybersecurity improvements), retention of key talent, additions to analyst and portfolio management teams, and regulatory support enhancements. The Trustees also considered whether it would be appropriate to add advisory fee breakpoints and the Trustees concluded that the current fee structure was reasonable in light of the Fee Caps that the Adviser has in place that serve to limit the overall net expense ratios of each Fund at competitive levels. The Trustees concluded that the Funds' shareholders received the benefits of potential economies of scale through the Fee Caps and the Adviser's reinvestment in its operations to serve the Funds and their shareholders.

*Independent Written Evaluation of the Funds' Chief Compliance Officer*

The Trustees noted that, upon their direction, the Chief Compliance Officer for the Funds had prepared an independent written evaluation in order to assist the Trustees in determining the reasonableness of the proposed management fees. The Trustees considered the written evaluation in determining whether to continue the Advisory Agreements.

*Fees Relative to Adviser's Other Clients*

The Trustees received and considered information about the nature and extent of investment advisory services and fee rates offered to other clients of the Adviser, including institutional separate accounts and/or funds sub-advised by the Adviser, and for investment management styles substantially similar to that of each Fund. The Trustees considered the complexity of investment management for registered mutual funds relative to the Adviser's other clients and noted differences in the regulatory, legal and other risks and responsibilities of providing services to the different clients. The Trustees considered that serving as an adviser to a registered mutual fund involves greater responsibilities and risks than acting as a sub-adviser and observed that sub-advisory fees may be lower than those charged by the Adviser to each Fund. The Trustees also noted that the adviser, not the mutual fund, pays the sub-advisory fee and that many responsibilities related to the advisory function are retained by the primary adviser. The Trustees concluded that the fee rates charged to each Fund in comparison to those charged to the Adviser's other clients were reasonable.

*Investment Performance*

The Trustees received and considered absolute and/or relative performance for the Funds in a report prepared by Broadridge/Lipper. The Trustees considered the total return performance information, which included the ranking of the Funds within a performance universe made up of funds with the same Broadridge/Lipper investment classification and objective (the "Universe"), as well as a sub-set of funds within the Universe (the "Peer Group"), by total return for applicable one-, three- and five-year periods. The Trustees reviewed a description of Broadridge/Lipper's methodology for selecting mutual funds in each Fund's Peer Group and Universe. The Broadridge/Lipper materials provided to the Trustees highlighted information with respect to certain representative classes to assist the Trustees in their review.

As part of this review, the Trustees also reviewed each Fund's performance against its benchmark and considered the performance information provided for the Funds at regular Board meetings by the Adviser and the Trustees' independent consultant and also considered the special analysis prepared by the Trustees' independent consultant. The Broadridge/Lipper performance data noted by the Trustees as part of their review and the determinations made by the Trustees with respect to each Fund's performance for certain representative classes are summarized below:

***.

The Trustees noted that the U.S. Large Cap Core Plus Fund's performance for Class A shares was in the third, third, and fourth quintiles, based upon the Universe, for the one-, three-, and five-year periods ended December 31, 2015, respectively. The Trustees noted that the performance for Select Class shares was in the third, second, and third quintiles, based upon the Universe, for the one-, three-, and five-year periods ended December 31, 2015, respectively. The Trustees discussed the performance and investment strategy of the Fund with the Adviser and reviewed the performance analysis prepared by the independent consultant. Based upon these discussions, and various other factors, the Trustees concluded that the Fund's performance was reasonable.

*Advisory Fees and Expense Ratios*

The Trustees considered the contractual advisory fee rate paid by each Fund to the Adviser and compared that rate to the information prepared by Broadridge/Lipper concerning management fee rates paid by other funds in the same Broadridge/Lipper category as each Fund. The Trustees recognized that Broadridge/Lipper reported each Fund's management fee rate as the combined contractual advisory fee and administration fee rates. The Trustees also reviewed information about other expenses and the expense ratios for each Fund. The Trustees considered the fee waiver and/or expense reimbursement arrangements currently in place for each Fund and considered the net advisory fee rate after taking into account any waivers and/or reimbursements. The Trustees recognized that it is difficult to make comparisons of advisory fees because there are variations in the services that are included in the fees paid by other funds. The Trustees' determinations as a result of the review of each Fund's advisory fees and expense ratios for certain representative classes are summarized below:

***

> The Trustees noted that the U.S. Large Cap Core Plus Fund's net advisory fee and actual total expenses for Select Class shares were in the first quintile of the Universe. After considering the factors identified above, in light of this information, the Trustees concluded that the advisory fee was reasonable.

*See* Semi-Annual Report at 42-44.

186.    The description of the approval process in the Semi-Annual Report was not intended to be, and is not, an accurate depiction of the Board's fee evaluation and approval process, and does not reflect Defendant's or the Board's efforts to engage in a good-faith process designed to guard against taking excessive investment advisory fees. Rather, and primarily, it reflects Defendant's efforts to shield, from legal challenge under § 36(b), a deficient fee approval process that was designed and operated to ensure taking excessive investment advisory fees from the Fund.  Closely examined, the description of the Fee Approval Summary is:

      a.    self-serving hearsay;

      b.    boilerplate;

      c.    indicative of a deficient fee approval procedure, insofar as it indicates that the Board's approval of the Fund's advisory fees was based on inaccurate and/or incomplete information, and that the Board lacked adequate conscientiousness in its evaluation of such information and in reaching the conclusions stated therein, that those conclusions were without adequate basis and, frequently, counterfactual.

187.    First, Fee Approval Summary communicates, in the first instance, the *authorial intent* to describe an adequate fee approval process in which relevant information with respect to each applicable *Gartenberg* factor was considered, but does not establish that such description is in fact accurate and does not actually provide any concrete or particularized support.

a.      For example, the Fee Approval Summary purports to provide specifics concerning the Board's fee approval process, but is in fact largely boilerplate, repeated annually and near-verbatim in the Fund's Semi-Annual Reports for at least the last five years.

b.      Likewise, although the remainder of the Fee Approval Summary description purports to further detail the Board's fee approval process, such further detail remains conclusory and devoid of almost any particularized facts.  It thus does not provide or reveal any adequate basis for the Board's fee approval.

c.      Lastly, the remainder of the Fee Approval Summary description indicates in substantial part the very opposite of what it purports to say:  namely, that the Board's conclusions lacked adequate basis or were counterfactual – and thus, relatedly, that the Board failed to consider, and/or Defendant failed to furnish adequate, accurate and complete information relevant to fee evaluation and approval.

188.    Second, although the Fee Approval Summary, after asserting the Board's purported consideration of information relating to each *Gartenberg* factor, claims to proffer more specific factual information concerning the Board's review relating to each such factor, the remainder of the Fee Approval Summary is in fact mere boilerplate.   The same purportedly-specific description is repeated annually, and substantially-verbatim, in each of the Semi-Annual Reports filed by the Fund during the last five years (at least).  *See e.g.* the Fund's Semi-Annual Reports on Form N-CSRS, filed with the SEC on:

a.      March 4, 2016, at 43-45;

b.      February 27, 2015, at 67-69;

c.      March 7, 2014, at 59-61;

d.      March 6, 2013, at 59-61; and

e.      March 12, 2012, at 70-72.[11]

189.    That substantially-identical Fee Approval Summaries were provided in each Semi-Annual Report during the past five years is, at a minimum, a noteworthy indication that the Fee Approval Summary is *not* a particularized description of the Board's actual fee evaluation and approval process (unless such process is little more than a rubber-stamping), but rather a standard and wholly general form of disclosure used by Defendant year after year after year.

190.    Third, and as further detailed in Sections VII.F.3.a-f immediately below, while the Fee Approval Summary purports to further detail the fee approval process and the information the Board considered with respect to each *Gartenberg* factor, such further detail itself remains largely conclusory and devoid of any particularized facts, and thus fails to establish or communicate any adequate basis for the Board's fee approval.

### a.  Board Evaluation of Fee Comparisons

191.    Although the Fee Approval Summary asserts that the Board approved the Fund's advisory fees as reasonable after conducting certain fee comparisons, the Fee Approval Summary actually indicates that the fee comparison information reviewed by the Board was materially inaccurate and incomplete, and that the Board's evaluation and conclusions with respect to comparative fees were without adequate basis, flawed and in fact counterfactual.

192.    As an initial matter, the Fee Approval Summary indicates that the Board's fee comparisons were fundamentally similar to the fee comparisons presented here – namely, comparisons to the fees paid by (1) Defendant's other clients, including mutual funds for which

---

[11] Close reading indicates that the standard Fee Approval Summary boilerplate was changed and expanded slightly beginning in the March 4, 2016 Form N-CSRS (and copied in the most recent Fee Approval Summary quoted above), such that (1) boilerplate assertions concerning economies of scale were lengthened, and (2) boilerplate assertions concerning fee comparisons to JPMIM's other clients were lengthened.  In addition, the most recent Fee Approval Summary reveals one additional and new variation:  an apparent switch in the independent data provider used to provide comparative data on Fund performance and expenses (from Lipper to Broadridge).

JPMIM served as a subadviser, that received similar services as the Fund, and (3) comparable

mutual funds:

> . . . The Trustees received and considered information about the nature and extent of investment advisory services and fee rates offered to other clients of the Adviser, including institutional separate accounts and/or funds sub-advised by the Adviser, and for investment management styles substantially similar to that of each Fund.
>
> ***
>
> The Trustees considered the contractual advisory fee rate paid by each Fund to the Adviser and compared that rate to the information prepared by Broadridge/Lipper concerning management fee rates paid by other funds in the same Broadridge/Lipper category as each Fund.

*See* Fund Semi-Annual Report at 43 and 44.

193.     Moreover, as Fee Approval Summary concedes, these fee comparisons indicated

to the Board the same result as the fee comparisons presented in full detail here – namely and

invariably, that the Fund paid *higher* advisory fees than (1) Defendant's other clients receiving

similar investment strategies, and (2) other similar mutual funds (*see* Section VII.A.1-2, *supra*):

> The Trustees [] observed that sub-advisory fees may be lower than those charged by the Adviser to each Fund.
>
> ***
>
> The Trustees noted that the U.S. Large Cap Core Plus Fund's net advisory fee and actual total expenses for Select Class shares were in the first quintile of the Universe …

*Id.* at 43-44.

194.     However, notwithstanding such similar factual comparisons and similar factual

results, the Board arrived at conclusion that is *exactly opposite* to the one here – namely, that the

Fund's fees were reasonable, rather than excessive.

195. As the Fee Approval Summary further indicates, the Board was led to this counterfactual conclusion:

        a.    by Defendant, who provided the Board with crucial misinformation concerning the services received in exchange for such differing fees; and

        b.    by further acts of commission (consideration of irrelevant facts) and omission (failure to consider relevant facts).

196. All of the above deficiencies are evident in the Fee Approval Summary's depiction of the process, reasoning and information purportedly employed by the Board to 'explain away' the inconvenient fact that JPMIM charged lower fees for subadvised funds than it did to captive JPMC Fund Family funds:

> The Trustees received and considered information about the nature and extent of investment advisory services and fee rates offered to other clients of the Adviser, including institutional separate accounts and/or funds sub-advised by the Adviser, and for investment management styles substantially similar to that of each Fund. The Trustees considered the complexity of investment management for registered mutual funds relative to the Adviser's other clients and noted differences in the regulatory, legal and other risks and responsibilities of providing services to the different clients. The Trustees considered that serving as an adviser to a registered mutual fund involves greater responsibilities and risks than acting as a sub-adviser and observed that **sub-advisory fees may be lower than those charged by the Adviser to each Fund**. The Trustees also noted that the adviser, not the mutual fund, pays the sub-advisory fee and that many responsibilities related to the advisory function are retained by the primary adviser. The Trustees concluded that the fee rates charged to each Fund in comparison to those charged to the Adviser's other clients were reasonable.

*Id.* at 43 (emphasis added).

197. First, the Fee Approval Summary explains that the "Trustees **received and considered** information about the nature and extent of investment advisory services" (emphasis added) that JPMIM offered to captive funds versus to other clients (such as subadvised) funds,

and that such information indicated to them "that serving as an adviser to a registered mutual fund involves greater responsibilities and risks than acting as a sub-adviser."  This information "received" by the Trustees formed the primary basis for them to disregard the fact that JPMIM's captive fund fee rates were higher than its subadvisory fee rates:  *i.e*., the services that JPMIM provided as an adviser were purportedly "greater" than those JPMIM provided as a subadviser.

198.    However, the Trustees "received" this information *from JPMIM* (which, as part of the 15(c) process, was required to provide the Trustees with information).   JPMIM, and JPMIM's provision of such information, was not objective, but biased.  JPMIM did not provide the Trustees with an objective analysis of the degree and extent to which advisory services were greater than subadvisory services, but instead provided the Trustees with slanted facts designed to create a distinction as great as possible between advisory and subadvisory services.

199.    Put simply, JPMIM provided the Board with self-serving misinformation concerning the differences between the services JPMIM provided as adviser and subadviser. Such misinformation led the Board to conclude that the Fund's fees, though higher, were reasonable.

200.    Extensive and detailed factual allegations here, which closely compare both (1) the general scope of JPMIM's advisory services (to the Fund) and subadvisory services (for the PSF Subadvised Fund), and (2) the concrete delivery of such services to the two funds, down to the smallest details, demonstrate that the investment advisory services that JPMIM provided were substantially similar and in largest part *identical*.  *See* Section VII.A.1.a, *supra*.  Indeed, the Portfolio Selection Services, which form the largest and by far most important part of total investment advisory services, were largely identical.  *Id*.  And, if anything, the Other Services

required of JPMIM as subadviser to the PSF Subadvised Fund under the PMA were greater than the Other Services required of JPMIM as adviser to the Fund under the IAA. *Id.*

201.    JPMIM did not provide the Board with such particularized and/or extensive facts (for example, the degree of similarity between the Fund and the PSF Subadvised Fund, or the PMA setting forth the services required of JPMIM as subadviser). Notably, notwithstanding that Fee Approval Summary's declarative assertion that acting as an adviser entailed "greater responsibilities and risks," the Fee Approval Summary:

    a.    neither identifies any such "greater responsibilities and risks,"

    b.    nor proffers any analysis quantifying the extent to which such "greater responsibilities and risks" account for or justify greater fees – by, for example, imposing greater costs.

202.    Second, the Fee Approval Summary further indicates that the "Trustees also noted that the adviser, not the mutual fund, pays the sub-advisory fee . . ." This fact, however, is entirely irrelevant. The matter at hand is, simply:  (1) the fees JPMIM received (no matter who paid them); and (2) the services JPMIM provided to earn such fees.

203.    Third, JPMIM did not present the Board with information concerning, and the Board did not consider, the similar services that JPMIM provided to the JPM Equity Fund for *half the advisory fee rate charged to the Fund* (even though the JPM Equity Fund imposed higher costs on JPMIM to advise). *See* Section VII.A.1.a, *supra.* Indeed, the comparison of the Fund to the JPM Equity Fund sidesteps entirely the specific matter of the existence or extent of differences between advisory and subadvisory services (and, indeed the more general matter of different types of clients), as both funds were JPMIM-advised funds housed in the same

registered investment company, the JPMC Trust, and served by exactly the same array of service providers in exactly the same roles working under exactly the same service contracts. *Id.*

204.    And lastly, the Fee Approval Summary's depiction of the Board's review, reasoning process and conclusions concerning fee comparisons to other similar mutual funds indicates a more straightforward, but equally deficient, process:

> The Trustees considered the contractual advisory fee rate paid by each Fund to the Adviser and compared that rate to the information prepared by Broadridge/Lipper concerning management fee rates paid by other funds in the same Broadridge/Lipper category as each Fund. . .
>
> ***
>
> The Trustees noted that the U.S. Large Cap Core Plus Fund's net advisory fee and actual total expenses for Select Class shares were in the first quintile of the Universe. After considering the factors identified above, in light of this information, the Trustees concluded that the advisory fee was reasonable.

*Id.* at 44.

205.    The information reviewed by the Board appears to have been substantially identical to the information presented here:  that the Fund's advisory fees were among the highest (per the Fee Approval's Summary imprecise description – "first quintile," indicating that the Fund's fees ranked in the highest 20%) or the single highest (per the more particularized facts presented in Section VII.A.2, *supra*) charged by comparable mutual funds.

206.    Yet the Fee Approval Summary indicates that the Board – simply and effectively – *disregarded* this relevant information.  Indeed, immediately after observing that the Fund's fees were at the highest end of the range, the Board in its very next breath "concluded that the advisory fee was reasonable."  The immediate juxtaposition of these two jostling facts – Fund fees higher than those of almost all or all other similar mutual funds; and a declarative

conclusion that Fund fees that were reasonable – simply highlights the Board's disregard of the former in order to be able to declare the latter.

### b. Board Evaluation of Economies of Scale

207.     With respect to economies of scale, the Fee Approval Summary proffered the following:

> Economies of Scale
>
> The Trustees considered the extent to which the Funds may benefit from economies of scale. The Trustees considered that there may not be a direct relationship between economies of scale realized by the Funds and those realized by the Adviser as assets increase. The Trustees noted that the proposed investment advisory fee schedule for each Fund does not contain breakpoints, but that the fees remain competitive with peer funds. The Trustees also considered that the Adviser has implemented fee waivers and expense limitations ("Fee Caps") which allow each Fund's shareholders to share potential economies of scale from a Fund's inception. The Trustees also considered that the Adviser has shared economies of scale by adding or enhancing services to the Funds over time, noting the Adviser's substantial investments in its business in support of the Funds, including investments in trading systems and technology (including cybersecurity improvements), retention of key talent, additions to analyst and portfolio management teams, and regulatory support enhancements. The Trustees also considered whether it would be appropriate to add advisory fee breakpoints and the Trustees concluded that the current fee structure was reasonable in light of the Fee Caps that the Adviser has in place that serve to limit the overall net expense ratios of each Fund at competitive levels. The Trustees concluded that the Funds' shareholders received the benefits of potential economies of scale through the Fee Caps and the Adviser's reinvestment in its operations to serve the Funds and their shareholders.

*Id.* at 43.

208.     For the reasons set forth below, the Fee Approval Summary indicates that the economies of scale information reviewed by the Board was materially incomplete, and that the Board's evaluation and conclusions with respect to economies of scale were without adequate basis, flawed and in fact counterfactual.

88

209.    Fairly read, the Fee Approval Summary indicates that the Board's approach to the economies of scale factor was merely to *observe* the presence of the *expense* caps provided by the Fee Waiver (imprecisely termed "Fee Caps"), and thereafter simply to assume that (1) *if* any economies of scale existed (notably, the Fee Approval Summary refers only to "potential economies of scale"); then (2) the Fund's Fee Caps and JPMIM's investments to improve its advisory operations would function to share them.  *Id.*

210.    But equally and in other words, the Fee Approval Summary indicates that the Board neither performed, nor was provided with:

  a.      any analysis of the Fund's *actual* economies of scale;

  b.      any analysis of the Fee Caps' *actual* effects; and/or

  c.      any analysis of the amounts that JPMIM reinvested to improve operations and purportedly thereby share the benefits of such economies.  *Id.*

211.    Therefore, the Board's *sole* basis with respect to its consideration of and conclusion concerning economies of scale, was the limited and entirely superficial observation that the Fee Waiver capped Fund total expense ratios and that JPMIM had invested unspecified amounts to expand or improve its advisory operations.

212.    Such basis was inadequate to support the Board's conclusions.

213.    The concrete analysis performed here – on the basis of the limited data publicly available concerning JPMIM's work and expenses – indicates that such economies were quite large, and that, because the IAA imposed no fee breakpoints on the Fund's flat 0.80% fee rate, such benefits were monopolized in entirety by JPMIM.  *See* Section VII.B.2, *supra*.

214.    Indeed, as Defendant has access to its own and more extensive relevant data concerning its actual work and costs, such analysis was *uniquely available* to the Board as a

result of Defendant's and the Board's obligations under Section 15 of the ICA.  As such more extensive data would further particularize and confirm Plaintiff's analysis here, Defendant's failure to provide such information to the Board, and the Board's failure to request such information from Defendant, led the Board to a conclusion that was not merely without adequate support, but counterfactual.

### c.  Board Evaluation of the Nature, Extent and Quality of Services

215.   Although the Fee Approval Summary includes lengthy, generalized boilerplate concerning the Board's evaluation of the nature and quality of JPMIM's services,[12] the nature of

---

[12] Specifically:

> The Trustees received and considered information regarding the nature, extent and quality of the services provided to each Fund under the Advisory Agreement. The Trustees took into account information furnished throughout the year at Trustee meetings, as well as the materials furnished specifically in connection with this annual review process. The Trustees considered the background and experience of the Adviser's senior management and the expertise of, and the amount of attention given to each Fund by, investment personnel of the Adviser. In addition, the Trustees reviewed the qualifications, backgrounds and responsibilities of the portfolio management team primarily responsible for the day-to-day management of each Fund and the infrastructure supporting the team. The Trustees also considered information provided by the Adviser and JPMorgan Distribution Services, Inc. ("JPMDS") about the structure and distribution strategy of each Fund. The Trustees reviewed information relating to the Adviser's risk governance model and reports showing the Adviser's compliance structure and ongoing compliance processes. The Trustees also considered the quality of the administrative services provided by J.P. Morgan Investment Management Inc. in its role as administrator ("JPMIM").

> The Trustees also considered their knowledge of the nature and quality of the services provided by the Adviser and its affiliates to the Funds gained from their experience as Trustees of the J.P. Morgan Funds. In addition, they considered the overall reputation and capabilities of the Adviser and its affiliates, the commitment of the Adviser to provide high quality service to the Funds, their overall confidence in the Adviser's integrity and the Adviser's responsiveness to questions or concerns raised by them, including the Adviser's willingness to consider and implement organizational and operational changes designed to improve investment results and the services provided to each Fund.

> Based upon these considerations and other factors, the Trustees concluded that they were satisfied with the nature, extent and quality of the investment advisory services provided to the Funds by the Adviser."

the services is, simply and largely, Portfolio Selection Services, and the quality of such services is, simply and largely, the Fund's performance (produced by such Portfolio Selection Services).

216.   Consequently, as the Fee Approval Summary indicates, the Board's evaluation of this factor focuses to very large extent on comparative analysis of the Fund's performance:

> As part of their review of the Advisory Agreements, the Trustees considered and reviewed performance and other information received about the Funds from the Adviser. This information includes the Funds' performance as compared to the performance of their peers and benchmarks and analyses by the Adviser of the Funds' performance. In addition, the Trustees have engaged an independent management consulting firm ("independent consultant") to report on the performance of certain J.P. Morgan Funds at each of the Trustees' regular meetings. The Adviser also periodically provides comparative information regarding the Funds' expense ratios and those of their peer groups. In addition, in preparation for the June and August meetings, the Trustees requested, received and evaluated extensive materials from the Adviser, including performance and expense information compiled by Broadridge, using data from Lipper Inc., independent providers of investment company data (together, "Broadridge/Lipper"). The Trustees' independent consultant also provided additional analyses of the performance of the Funds in connection with the Trustees' review of the Advisory Agreements.

> ***

> *Investment Performance*

> The Trustees received and considered absolute and/or relative performance for the Funds in a report prepared by Broadridge/Lipper. The Trustees considered the total return performance information, which included the ranking of the Funds within a performance universe made up of funds with the same Broadridge/Lipper investment classification and objective (the "Universe"), as well as a sub-set of funds within the Universe (the "Peer Group"), by total return for applicable one-, three- and five-year periods. The Trustees reviewed a description of Broadridge/Lipper's methodology for selecting mutual funds in each Fund's Peer Group and Universe. The Broadridge/Lipper materials provided to the Trustees highlighted information with

---

*See* Fund Semi-Annual Report at 42-43.

respect to certain representative classes to assist the Trustees in their review.

As part of this review, the Trustees also reviewed each Fund's performance against its benchmark and considered the performance information provided for the Funds at regular Board meetings by the Adviser and the Trustees' independent consultant and also considered the special analysis prepared by the Trustees' independent consultant. The Broadridge/Lipper performance data noted by the Trustees as part of their review and the determinations made by the Trustees with respect to each Fund's performance for certain representative classes are summarized below.

*See* Fund Semi-Annual Report, at 42 and 44.

217. The information provided to the Board indicated that the Fund's comparative performance was, effectively, middling – under most analyses for most time periods, the Fund was ranked in the third (*i.e.*, the middle) quintile among all comparable funds:

The Trustees noted that the U.S. Large Cap Core Plus Fund's performance for Class A shares was in the third, third, and fourth quintiles, based upon the Universe, for the one-, three-, and five-year periods ended December 31, 2015, respectively. The Trustees noted that the performance for Select Class shares was in the third, second, and third quintiles, based upon the Universe, for the one-, three-, and five-year periods ended December 31, 2015, respectively. The Trustees discussed the performance and investment strategy of the Fund with the Adviser and reviewed the performance analysis prepared by the independent consultant. Based upon these discussions, and various other factors, the Trustees concluded that the Fund's performance was reasonable.

*Id.* at 44.

218. However, the Board's conclusion that Fund fees were reasonable, in light of Fund performance, lacks adequate basis and/or is counterfactual.  As set forth herein (*see* Section VII.C.2, *supra*), the Fund's level of performance (middling) fails to rise to the level of its advisory fees (among the highest, according to the Fee Approval Summary's less precise "first quintile" description, and the very highest, according to the more particularized allegations here – *see* Section VII.A.2, *supra*).

219.   While consistent over-performance may support higher fees, consistently average performance does not.

### d.  Board Evaluation of Profitability

220.   The Fee Approval Summary asserts that the Board approved the Fund's advisory fees after purported consideration of JPMIM's profits:

> *Costs of Services Provided and Profitability to the Adviser and its Affiliates*
>
> The Trustees received and considered information regarding the profitability to the Adviser and its affiliates in providing services to each of the Funds. The Trustees reviewed and discussed this data. The Trustees recognized that this data is not audited and represents the Adviser's determination of its and its affiliates' revenues from the contractual services provided to the Funds, less expenses of providing such services. Expenses include direct and indirect costs and are calculated using an allocation methodology developed by the Adviser. The Trustees also recognized that it is difficult to make comparisons of profitability from fund investment advisory contracts because comparative information is not generally publicly available and is affected by numerous factors, including the structure of the particular adviser, the types of funds it manages, its business mix, numerous assumptions regarding allocations and the fact that publicly-traded fund managers' operating profits and net income are net of distribution and marketing expenses. Based upon their review, the Trustees concluded that the profitability to the Adviser under each of the Advisory Agreements was not unreasonable in light of the services and benefits provided to each Fund.

*See* Fund Semi-Annual Report, at 43.

221.   For the reasons set forth below, the Fee Approval Summary indicates that:

a.   JPMIM presented the Board with incomplete and misleading information concerning its profitability; and

b.   the Board's conclusion that fees were reasonable in light of JPMIM's purported profitability lacked adequate basis and/or was counterfactual.

222.     As an initial matter, the Fee Approval Summary makes clear that the information as to JPMIM's profitability that was provided to the Board was not in the form of audited, independently-verified financial statements, but rather consisted of "**the Adviser's determination** of its and its affiliates' revenues from the contractual services provided to the Funds, less expenses of providing such services [] calculated using an allocation methodology developed by the Adviser." (emphasis added)

223.     This profitability information suffered from at least three flaws:

a.      First, by including JPMIM's "affiliates" into the analysis, JPMIM obscured the matter at issue: *JPMIM's* profitability specifically.

b.      Second, the cost "allocation methodology developed by the Adviser" – which, upon information and belief, allocated many costs to the Fund and other JPM Fund Family funds based on such funds' AUM – was fundamentally inaccurate, allocated excessive costs to the Fund, and thereby artificially under-reported the true profitability of the Fund to JPMIM.   Specifically, by allocating costs by Fund AUM (so that costs to provide advisory services rose in exact proportion to AUM), JPMIM improperly and inaccurately pretended – and presented matters – as if economies of scale did not exist.   This contravenes not only detailed factual allegations presented here indicating that, for the Fund, they do exist (*see* Section VII.B.2, *supra*), but the legislative intent of Section 36(b) of ICA, which was founded in part on understanding that such economies of scale existed (*see* Section IV.D., *supra*).

c.      Third, the profitability information provided to the Board by JPMIM contained none of the factual information alleged here (see Section VII.D, *supra*) indicating that JPMIM reaped excessive profits from the Fund.

224.    Indeed, the data presented here (*see* Section VII.D, *supra*) – but neither provided to nor considered by the Board – provides good reason to believe that JPMIM's Fund-related profits were extreme and excessive, given *inter alia:*

      a.    the very high advisory fees charged to the Fund, as compared with:

           i)    all other comparable mutual funds managed by all other investment advisers;

           ii)    all other large equity-focused Funds in the JPMC Fund Family; and

           iii)    the JPM Equity Fund, which cost JPMIM *more* to advise but which JPMIM still profited from even as it charged an advisory fee rate *half* that of the Fund's;

      b.    the very large size of the Fund, the consequent large economies of scale enjoyed by JPMIM in providing it with advisory services, and Defendant's monopolization of the benefits flowing from such economies given the absence of any fee breakpoints in the IAA's fee rate schedule – the combination of which operated to boost JPMIM's Fund-related profits to unusually high levels.

### e.   Board Evaluation of Fallout Benefits

225.    With respect to fall-out benefits, the Fee Approval Summary explained:

Fall-Out Benefits

The Trustees reviewed information regarding potential "fallout" or ancillary benefits received by the Adviser and its affiliates as a result of their relationship with the Funds. The Trustees also reviewed the Adviser's allocation of fund brokerage for the J.P. Morgan Funds complex, including allocations to brokers who provide research to the Adviser.

The Trustees also considered that JPMDS, an affiliate of the Adviser, and JPMIM earn fees from the Funds for providing

> shareholder and administrative services, respectively. These fees
> were shown separately in the profitability analysis presented to the
> Trustees. The Trustees also considered the payments of Rule 12b-1
> fees to JPMDS, which also acts as the Funds' distributor and that
> these fees are in turn generally paid to financial intermediaries that
> sell the Funds, including financial intermediaries that are affiliates
> of the Adviser. The Trustees also considered the fees paid to
> JPMorgan Chase Bank, N.A. ("JPMCB") for custody and fund
> accounting and other related services.

*See* Fund Semi Annual Report at 43.

226.    As the above indicates, the Board "considered" one of the two fall-out benefits

alleged here – the additional fee streams paid to JPMIM and its affiliates from riding JPMIM's

coattails as Fund adviser to be appointed as the Fund's other service providers.  *See* Section

VII.E, *supra*.  However, this consideration is unaccompanied by any conclusion as to the extent

or propriety of this fall-out benefit.[13]

227.    Conversely, the Fee Approval Summary therefore also indicates that the Board

was not presented with information concerning, and failed to review or analyze, the second fall-

out benefit alleged here:  the additional advisory fee stream JPMIM derived from providing

"clones" of the Fund to other clients, which JPMIM could spin off and operate at little or no

additional cost.  *See* Section VII.E, *supra*.  The resulting advisory fee streams, unlike the fee

streams from providing the Fund with additional services (at additional cost to JPMIM and its

affiliates to provide such services), were therefore experienced by JPMIM as almost pure profit.

*Id*.

228.    Such revenue, and even more so such profits, would not have accrued to JPMIM

if not for its relationship with the Fund.  Absent such relationship, JPMIM would not have had

---

[13] The Fee Approval Summary may mean to indicate that the Board, which was "shown" these fall-out benefit fee
streams in connection with the above-mentioned "profitability analysis," found such fall-out benefits reasonable as
part and parcel of finding JPMIM's overall profitability reasonable.  However, due to the deficiencies identified
above with respect to the Board's review and conclusions concerning profitability, attempts to clothe fall-out
benefits in the cloak of profitability's purported reasonableness are unavailing.

the original from which to spin off copies. And although JPMIM could develop original investment strategies had the Fund not existed, JPMIM would have had to invest in personnel and resources to do so, thereby decreasing the profitability of such strategies (versus near-cost-free spin-offs), and/or increase the rates charged for such strategies (versus the lower rates effectively subsidized by the Fund) and thereby decrease their marketability.

4.     **The Board Rubber-Stamped the Advisory Fees that JPMIM Proposed**

229.    None of the above-detailed information relevant to evaluation of advisory fees is particularly new, or confronted the Board with new facts.

a.     The Fund's 0.80% advisory fee is and has long been an outlier, far above the average rates charged to similar funds of similar size, and in fact higher than:

      i)     *all* other mutual funds of similar strategy and similar large size; and

      ii)     *all* other equity-focused mutual funds in the JPMC Fund Family of similarly large size.

b.     The Fund's net assets rose nearly 6-fold between 2007 and 2015, from approximately $1.4 billion to approximately $11.9 billion, while the number of positions that JPMIM managed in the Fund's portfolio – and the number of portfolio managers utilized by JPMIM to manage the Fund – both increased by approximately 50%. Therefore, economies of scale have long been present – and, given that the IAA has *never* included fee rate breakpoints, have never been shared with the Fund or Fund shareholders.

c.     Similarly, the fall-out benefits alleged here – arising from JPMIM's provision of Fund "clones" to clients like PLFA and the PSF Subadvised Fund – have likewise long accrued to JPMIM's benefit.   For example, JPMIM has served as subadviser for the PSF

Subadvised Fund since mid-2008. *See* Ex. B (PMA dated May 1, 2008 appointing JPMIM as subadviser for the PSF Subadvised Fund).

230.     Notwithstanding the long and continuing existence of the above facts and factors, the Board has continued to approve the advisory fee rates proposed by JPMIM using the same purported analysis to arrive at the same conclusions.

231.     There is little indication that the Board did anything other than rubber-stamp the investment advisory fees that JPMIM proposed.

232.     The Board's rubber-stamping has allowed JPMIM to continue to maintain and enjoy excessive investment advisory fees from the Fund for many years, and through this day.

233.     The Board's captive behavior and/or lack of adequate conscientiousness in evaluating and approving the Fund's advisory stems, at least in part, from the fact that the information received by the Board is, in largest part, information packaged and presented by JPMIM.

234.     JPMIM did not provide the Board with sufficient, complete, and/or accurate information needed to fulfill its obligations, resulting in a fee-setting process that lacked good faith and integrity.

235.     In approving the IAA, the Board relied on information and analyses prepared by JPMIM and designed to support JPMIM's rationalizations for the fees charged to the Fund.   For example and as detailed above, the Fee Approval Summary indicates that JPMIM has not provided, and the Board has not considered, adequate information regarding, among other things: the advisory fees charged and services provided by JPMIM to other JPMIM advisory clients provided with substantially similar and/or effectively identical investment advisory services; the

economies of scale enjoyed and fall-out benefits received by JPMIM; and the profitability of the Fund to JPMIM (and how to evaluate profitability in light of economies of scale).

## VIII. THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND

236.  Investment advisory fees are paid to Defendant out of the Fund's assets.  Each dollar in fees paid by the Fund directly reduces the value of the Fund's investment portfolios by like amount.

237.  Additionally, the payment of excessive investment advisory fees to Defendant harms the Fund on a future basis because the Fund loses investment returns and profits that it could have earned on the amounts paid out as fees to Defendant.

238.  The Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendant.

239.  As set forth in Section VI.B.3, *supra*, Section 36(b) damages accrue for the period:

> a.    starting one year prior to complaint filing; and

> b.    continuing until resolution of the action.

240.  As also set forth in Section VI.B.3, *supra*, precise, fully-updated information on the investment advisory fees paid by the Funds for such period has not yet been disclosed.

241.  During the most recent complete fiscal year period for which Fund financial statements are available (the Fund's fiscal 2016, ended June 30, 2016), the Fund:

> a.    was assessed, at the IAA's applicable advisory fee rate, investment advisory fees of $90.25 million;

> b.    but under the Fee Waiver, JPMIM "waived" $12.699 million of such investment advisory fees payable; so that

c.      the Fund effectively paid investment advisory fees of $77.551 million.

242.    On the basis of this latter sum - *i.e.*, **advisory fees paid during fiscal 2016,** *post*

**Fee Waiver** – and on the fee comparison allegations set forth herein in Section VII.A, *supra*,

estimates of annual excessive fee damages are as follows:

**Annual Excessive Fee Damages**

| Fund Net Assets as of June 30, 2016 -- $9.876 billion<br>(All Comparisons Based on FY 2016 After Applying Fee Waiver) | | | |
|---|---|---|---|
| | *The Fund's fees if charged the same rate as...* | | |
| **The Fund's Actual Advisory Fees (Post-Waiver)** | **JPMIM received from the PSF Subadvised Fund** | **JPMIM received from the JPM Equity Fund** | **Average Comparable Large Funds (net assets > $1 billion)** |
| $77.551 million | $59.3 million<br><br>**Damages: $18.3 million** | $39.5 million<br><br>**Damages: $38.0 million** | $35.6 million<br><br>**Damages: $42.0 million** |

**CAUSES OF ACTION**

**COUNT I:**
**ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY**
**(EXCESSIVE INVESTMENT ADVISORY FEES)**

243.    Plaintiff repeats and realleges all of the foregoing allegations as if fully set forth

herein.

244.    Plaintiff asserts this count, on behalf of and for the benefit of the Fund, against

Defendant JPMIM.

245.    Defendant is the investment adviser to the Fund.

246.    Under Section 36(b), Defendant owes a fiduciary duty to the Fund with respect to

its receipt of investment advisory fees and other compensation from the Fund.

247.    Defendant breached its fiduciary duty under Section 36(b) by charging investment

advisory fees to the Fund that are so disproportionately large that they bear no reasonable

relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

248.    Defendant has received and continues to receive excessive investment advisory fees attributable to Defendant's retention and monopolization of substantial economies of scale benefits – and further fall-out benefits – in connection with Defendant's provision of investment advisory services to the Fund, and has shared none of such benefits with the Fund and/or the Fund's shareholders.

249.    The investment advisory fees charged by Defendant to the Fund are and have been grossly excessive in light of the true cost of providing those services to the Fund.

250.    In charging and receiving such excessive fees and failing to put the interests of the Fund or its shareholders, such as Plaintiff, ahead of its own interests, Defendant has breached its statutory fiduciary duties to the Fund and/or the Fund's shareholders.

251.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Fund has sustained millions of dollars in damages.

252.    Pursuant to Section 36(b)(3), Plaintiff seeks to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendant's breaches of its fiduciary duties, including the excessive investment advisory fees paid by the Fund to Defendant and investment returns that would have accrued to the Fund had those fees remained in the Fund's portfolios and available for investment.

253.    Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiff seeks rescission of the IAAs and restitution of all excessive investment advisory fees paid by the Fund pursuant to the IAAs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment on behalf of and for the benefit of the Fund, as follows:

A.     Declaring that Defendant violated Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), through receipt of excessive investment advisory fees from the Fund;

B.     Permanently enjoining Defendant from further violations of Section 36(b);

C.     Awarding compensatory damages against Defendant, including repayment to the Fund of all unlawful and excessive investment advisory fees paid to Defendant by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.     Rescinding the IAAs pursuant to Section 47 of the ICA, 15 U.S.C. § 80a-46, including restitution to the Fund of the excessive investment advisory fees paid to Defendant by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

E.     Awarding Plaintiff reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

F.     Such other and further relief as the Court may deem just and proper.

Dated:   April 27, 2017

Ira M. Press
David Bishop
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Plaintiff's Counsel*